

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DARRYL RIGGINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:05-cv-01915-JEO |
| | ) | |
| (HEAD WARDEN) KENNETH JONES, | ) | |
| (HEAD WARDEN) TERRANCE MCDONNELL, | ) | |
| (WARDEN) RODNEY HUNTLEY, | ) | |
| (CAPTAIN) JIMMIE RICHBURG, | ) | |
| (LT.) KENNETH CLARK, | ) | |
| (LT.) MELVIN WILSON, | ) | |
| (COI) R.L. (RONALD) HAWKINS, | ) | |
| (SGT.) RONALD CARTER, | ) | |
| (SGT.) WILLIE RYANS, | ) | |
| (SGT.) PETERSON,[1] | ) | |
| (M.D.) MELISSA BRIETLING,[2] | ) | |
| NURSE B. ROGERS, | ) | |
| NURSE SMITH, | ) | |
| RALPH ELLIS PRICE, and | ) | |
| LAWRENCE LEE HYNES,[3] | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

The plaintiff has filed numerous *pro se* motions for preliminary injunctive relief,

temporary restraining orders, declaratory judgments, and writs of mandamus stemming from his

epileptic and asthmatic condition in this 42 U.S.C. § 1983 action.  Those claims and requests for

preliminary relief that will be specifically addressed in this opinion are found in the complaint

---

[1]Peterson's name is also spelled "Petterson" in the various pleadings.  (See Doc. 1, August 21, 2005 Grievance).

[2]The plaintiff refers to this defendant as Breitling in various pleadings.  (See Doc. 62, Ex. 1).

[3]The plaintiff refers to his defendant as "Hines" in various pleadings.

(doc. 1);[4] the motions for preliminary injunctive relief and supporting briefs (doc. 4 & 5 (brief); doc. 55 & 56 (brief)); the motion for declaratory judgment (doc. 11); the supplemental complaint and request for temporary restraining order (doc. 14); the motion to have the defendants act within the power invested in them (doc. 29); the motions for emergency temporary restraining orders (doc. 43 & 48); the motion for summary judgment (doc. 45); the motion for a writ of mandamus (doc. 49); and the renewed motion for declaratory judgment relief (doc. 58). Prior to entering into an analysis concerning the foregoing, it is necessary for the undersigned to address, for the sake of clarity and efficiency, a number of other documents filed by the plaintiff.

## BACKGROUND

In addition to the pleadings listed above, along with responses by the defendants and replies by the plaintiff as to the specific claims and defendants in those pleadings, the plaintiff has filed a large number of documents since he initiated this action in September 2005. Many of these documents are related to the emergency injunctive relief he seeks and proposed amended pleadings that contain additional factual allegations and potential defendants as well as factual allegations pertaining to the claims already before the court. Others are letters, affidavits, or declarations concerning factual incidents.

Although there is a relationship between the additional information contained in the documents and the claims pertaining to preliminary injunctive relief addressed herein; collectively, the documents are such a voluminous mass of individual events and allegations involving various persons that, at best, it is difficult to unravel and clarify the issues, potential claims, and defendants presented by the plaintiff. Any attempt to consider these matters beyond

---

[4]"Doc. ___" are references to the documents in this matter that are located in the clerk's file.

that which the undersigned has directed the defendants to respond for purposes of the plaintiff's claims for preliminary relief will seriously undermine the need for efficiency and clarity on the pending motions for injunctive relief.  Although leave to amend should be freely granted, this court can conceive of no simple, concise manner to handle the additional information other than with regard to its relation to the original claims for purposes of these preliminary matters.

The additional motions are the plaintiff's motions to amend and supplement the complaint (doc. 27 & 28[5]) and his second motion to amend the complaint (doc. 52).  Additional affidavits and declarations referenced herein are also found throughout the court file.  (See Doc. 46, 50, 51, & 54).  Finally, he recently filed a document captioned "Motion for Objection of Defendant's Motion for Final Summary Judgment" wherein he asserts that he recently had another seizure on June 27, 2006.  (Doc. 64).  Upon consideration, the court finds that the motions to amend the complaint and supplemental complaint are permitted to the extent that the court will consider the allegations in determining the propriety of preliminary relief and to the extent that the defendants will be required by separate order to address the merits of the plaintiff's substantive medical claims.  An order so finding will be entered by the court. Accordingly, Sergeants Willie Ryans, Ronald Carter, and Peterson and Nurse B. Rogers will be added as defendants.

Also before the court is the motion to strike the affidavit of the plaintiff filed by one of the defendants.  (Doc. 31).  The motion, which was filed by defendant Breitling (doc. 31), seeks an order of the court striking a portion of the affidavit filed by the plaintiff.  It is due to be denied

---

[5]The plaintiff captions document 28 as a "Motion to Object and Request for Reconsideration for Motion to Amend under Rule 15(a)").  The court has treated the motion as a motion to amend and as a request for reconsideration of the denial of his motion to amend.  (Doc. 9).

to the extent that the information is being considered by the court on the preliminary matters presently before the court.[6]  An appropriate order will be entered concerning this motion.[7]

    An evidentiary hearing on the preliminary motions was conducted by the court at the institution on July 18, 2006.  The court received testimony from the plaintiff, Captain Richburg, and Dr. Hudson.  The court also accepted the proffer of the plaintiff that certain inmates, if allowed to testify, would state that they heard the plaintiff having an "episode" and that it would take the corrections staff thirty to forty-five minutes to respond.[8]

### The Plaintiff's Claims

### An analysis of complaint, amended complaint, and supplemental complaint as they relate to the plaintiff's request for immediate injunctive relief

    In his initial complaint and motion for preliminary injunctive relief, filed September 12, 2005, the plaintiff requests an order directing the defendants to provide him adequate medical care for his epilepsy in the form of "a helmet[,] . . . padded cell . . . and adequate observation." (Doc. 1; Doc. 4 at p. 2).  He alleges that prior to his May 18, 2005, transfer from Holman Correctional Facility to W.E. Donaldson Correctional Facility, he wore a helmet as protection for his skull during his seizures.  (Doc. 1 at ¶ 2; Doc. 5 at p. 5).  The plaintiff wore his helmet at Donaldson Correctional Facility until June 17, 2005, when it was taken from him by Dr. Melissa Breitling.  (*Id*. at ¶ 3).

    Although the plaintiff admits that at that time he was receiving daily large amounts of

---

[6]This finding does not preclude the defendants' subsequent submission of a motion to strike the affidavit to the extent it might be offered in support of any substantive claim the plaintiff is advancing.

[7]The plaintiff also filed for a writ of mandamus with the Eleventh Circuit Court of Appeals.  It was denied by that court on April 14, 2006.

[8]These inmates include Earnest Arrington, Gerald Vann, James Bishop, Joseph Burns, and Earl Cunningham (also known as Abd-Salaam Nuba Amun).

medication for his epilepsy,[9] he complains that he had suffered no less than three serious seizures while at Donaldson, one lasting as long as 30 minutes.  (Doc. 5 at p. 3).  While seizing, the plaintiff declares that prison and medical staff refused to help him or seek assistance for him, and would not provide him any means by which he could protect his skull.  Because he had been left to seize on his own, the plaintiff contends he suffered severe cuts and bruising to his skull, and the left side of his body shook uncontrollably.  (*Id.*).  The plaintiff also alleges that the unpadded, crowded, and poorly ventilated cell he lived in was dangerous to his condition and that he had complained verbally and in writing to medical and prison officials about his inadequate treatment, to no avail.

According to the plaintiff, on August 20, 2005, he experienced a seizure.  When the other inmates saw it, they called for corrections personnel.  One of the responding officers was CO II Peterson who observed the plaintiff and is reported to have stated, leave him "he ain't going no where, leave his ass right there."  (Doc. 1, August 21, 2005 Grievance at p. 1).  When the plaintiff later stopped seizing, he found himself "laying in a pool of urine on the hard cement floor."  (*Id.*).

The plaintiff also alleges that Nurse Smith saw him having seizures on August 21, 2005, and left him after about two minutes, allowing him to continue seizing.[10]  (Doc. 1, August 21, 2005 Grievance at p. 1).  He further alleges that Nurse B. Rogers physically touched him, took

---

[9]1500 mg of Keppra, twice per day 60 mg of Phenobarbital, three times per day.   (Doc. 1 at ¶ 4).  Keppra is an anti-epileptic drug, and Phenobarbital may be used "to provide peripheral anticholinergic/antispasmodic action and mild sedation."  Physician's Desk Reference, 56th Edition, 2002, pp. 3313 & 2929, respectively.

[10]At the evidentiary hearing, the court enumerated the individuals it believed that the plaintiff was naming as a party.  When Nurse Smith's name was mentioned, the plaintiff informed the court that Smith was not to be named as a party defendant.  He further moved the court to dismiss Smith.

his treatment, and had him removed from the medical unit on August 23, 2005.  (Doc. 1, August 31, 2005 Grievance at p. 3).  He next states that he was refused treatment by Rogers after he "wrote up" complaints about Rogers to Hynes.  (*Id*.).  Finally, he asserts that on August 31, 2005, he went to the health care unit where Rogers and Smith told him that he was not going to get any more treatment.  (Doc. 1, August 31, 2005 Grievance at p. 1).

Approximately two weeks after the filing of his initial complaint, the plaintiff filed an additional motion and affidavit.  (Doc. 10 & 11).  The motion, which the court deemed a motion to amend and for injunctive relief, asserts that the plaintiff is a chronic asthmatic and that defendant Dr. Breitling discontinued all of his asthma medication, beginning in September 2005, in retaliation for his having complained to Hynes that Rogers interfered with his medical care on August 23 and August 31, 2005.  (Doc. 10).  The plaintiff contends he had scheduled appointments with Dr. Breitling on August 16, 2005, and September 13, 2005, to discuss his breathing complications, but she refused to meet with him.  (*Id*. at p. 2).  The plaintiff alleges "he can't and will not survive without proper treatment for [his] asthma."  (*Id*.).  He requests immediate injunctive relief.  (Doc. 11).

A short time later, he filed another motion, which he captioned as a motion for an immediate temporary restraining order.  (Doc. 14).  The court has construed the motion to be a supplemental complaint and request for temporary restraining order.  (*Id*.).  Therein, the plaintiff names two new defendants, Sgt. Ryans and Sgt. Carter, and makes new allegations against Ryans, Carter, Dr. Breitling, Captain Richburg, Officer Hawkins, Lt. Clark, and Lt. Wilson.[11]

---

[11]In so treating the plaintiff's pleading, the court allowed the addition of Sergeants Carter and Ryans as defendants. This was after it had denied the plaintiff's motion to amend the complaint (doc. 9), attempting to add Ryans, Carter, Sergeant Peterson, Nurse Rogers, and Nurse Smith.  (Doc. 16).  The motion to amend initially was denied because the plaintiff failed to provide any allegations in the motion against the defendants and because it was not in proper form.  (*Id*. at pp. 1-2).

Specifically, the plaintiff contends that on September 26, 2005, Dr. Breitling again discontinued nebulizer treatments for which he had been given a 90 day prescription only one week earlier by another physician. (*Id*. at p. 1). The plaintiff alleges that Dr. Breitling never even examined him for his asthmatic condition, and since September 26, 2005,[12] he has been struggling for breath. (*Id*. at p. 2).

Additionally, the plaintiff alleges that on September 23, 2005, Ryans, Carter, Captain Richburg, Officer Hawkins, Lt. Clark, and Lt. Wilson threatened to cause the plaintiff bodily harm in retaliation for his having filed this lawsuit. (Doc. 14 at p. 2). On that date, the plaintiff suffered a seizure, and, as he was regaining consciousness, defendant Ryans and "two other officers intentionally threw plaintiff to the hard cement floor[.] [The] plaintiff suffered massive swelling to the right side of [his] head from being thrown to the floor." (*Id*.).[13]

Then, on September 26, 2005, defendants Richburg and Carter told the plaintiff they were going "to beat [him] to death and make [him] seize . . . until he died[.]" (*Id*.). The officers "put their hands" on the plaintiff, and refused to allow him to obtain a body chart to document his injuries. (*Id*.). On the same day, Richburg and Carter confiscated all the plaintiff's legal books, postage stamps, and other personal belongings. (*Id*.). The plaintiff requests a temporary restraining order against said defendants. (*Id*. at p. 1).

On September 21, 2005, the court directed (doc. 8) the defendants to respond to the

---

[12]The plaintiff fails to mention that as of September 26, 2005, he was given a prescription for Theophilline, a bronchodilator, which he was administered three times per day throughout the end of September and all of October 2005. (Doc. 41).

[13]The plaintiff fails to mention that on September 23, 2005, he appeared in the prison infirmary, and reported that he had lost consciousness and fell out of his chair while reading legal work. (Doc. 25 & 41). The nurse's notes show no indication that the plaintiff complained he had been abused by anyone. (*Id*.).

plaintiff's complaint and request for preliminary injunctive relief, and on October 11, 2005, the defendants were directed (doc. 16) to respond to the plaintiff's amended complaint, supplemental complaint, request for preliminary injunctive relief, and request for temporary restraining order.

### Defendants' Responses

The defendants responded with supporting affidavits, denying the plaintiff's allegations. (Doc. 20, 22, 23, 25 & 62).[14]  The plaintiff was notified that the defendants' special reports would be considered motions for summary disposition of his pending motions.  (Doc. 26).  The plaintiff was advised as to the proper manner in which to respond to the defendants' motions for summary judgment pursuant to FED. R. CIV. P. 56 and *Griffith v. Wainwright*, 772 F.2d 822 (11th Cir. 1985).[15]

### The Plaintiff's Reply

The plaintiff has submitted various motions, responses, and affidavits in support of his position.  (Doc. 10, 29-30, 32-36, 46, 50-54, 59 & 64).  He further alleges that Breitling and the nurses repeatedly have been "smothering [the] plaintiff with amonia [sic] capsules" causing chemical burns to the inside of his nostrils and to his lip.  (Doc. 29 at pp. 1-2).  He also states that DOC personnel, including supervisors, failed to respond to his medical needs.  (*Id*. at p. 2).  He also asserts that the various defendants have failed to respond to his seizures that occurred during October 2005.  (Doc. 30, Plaintiff's Affidavits; Doc. 32).  Additionally, he has submitted affidavits indicating that he has requested medical assistance through various administrative

---

[14]There are three categories of defendants, each being represented by separate counsel.  The categories are the Department of Corrections ("DOC") defendants (doc. 20), Dr. Breitling (doc. 22 & 23), and the medical defendants (doc. 25).

[15]This memorandum opinion addresses only the plaintiff's requests for emergency preliminary, injunctive, and declaratory relief as to the claims described above.

vehicles that are available without success.  (Doc. 33-34).  He further has submitted the affidavit

of inmate Abd-Salaam Nuba Amun who states that he has observed the plaintiff's "seizure

attack[s] while being housed in a [sic] unpadded and unsupervised prison cell in solitary

confinement."  (Doc. 35 at p. 1).

### Supplemental Order to Respond

After consideration of all of the relevant pleadings and submissions on November 28,

2005, the undersigned directed the medical defendants and Dr. Breitling to provide additional

information and documentation concerning the plaintiff's medical care for the months of October

and November 2005, within ten days of the entry date of the order.  (Doc. 37).

Nurses Price and Hynes (the medical defendants), as well Dr. Breitling provided

information pertaining to the plaintiff's October and November 2005 medical care.  (Doc.

38-42).  Thereafter, the plaintiff filed his own motion for summary judgment and affidavits in

support thereof.  (Doc. 45, 46, & 50-54).[16]

### Plaintiff's "Motion for Objection"

On July 10, 2006, the plaintiff filed his latest motion asserting that he suffered another

seizure on June 27, 2006.  (Doc. 64 at ¶ 9).  Specifically, he states that he "seized for 45

[minutes] to one hour in [an] unobserved and unpadded cell . . . before any D.O.C. officials came

while other inmates hollered and kicked the doors to get help."  (*Id*. at ¶ 10).  As a consequence

of the court's review of the record and the plaintiff's most recent filing, the undersigned deemed

it appropriate to conduct an evidentiary hearing regarding these preliminary matters.

---

[16]The only information considered in the plaintiff's filings in this portion of the opinion are those necessary to resolve the claims related to the request for emergency injunctive relief.

**Evidentiary Hearing**

At the evidentiary hearing, the plaintiff testified that he did have another seizure on June 27, 2006, and that the corrections staff did not respond in a timely manner.  He stated that as a result of the seizure, he sustained bruising in and about his head, shoulder, and chest.  He was treated at the infirmary and returned to his cell later that day.  Medical records show that the plaintiff arrived at the healthcare unit on a stretcher, unresponsive, and with urine and stool stains on his clothing.  (Def. Ex. 2 at PHS Emergency Record Admission Date June 27, 2006).

The plaintiff also testified that he had another seizure on July 2, 2006.  It was a similar experience as that on June 27.  He again sustained bruising in the shoulder, chest, and head areas.  Medical records support his contention.  He was observed in the medical unit after he was brought there on a stretcher.  He was non-responsive and had a small amount of swelling and redness on his right front forehead.  (*Id*. at Emergency Record Admission Date July 2, 2006).  His clothing was once again soiled.  (*Id*.).  He became alert and oriented in a relatively short period of time.

The plaintiff further stated that he has experienced other seizures during the period of January through May 2006 at a rate of approximately two to three times a month.[17]  The plaintiff testified that during the various seizures, he would bite his tongue, "foam" at the mouth, and defecate on himself.  However, he did not report these incidents to the medical staff or seek medical attention through the usual process.  The plaintiff testified that the corrections officers do not conduct the regular cell checks as they are required every thirty minutes.  He asserts that this is in part why he is forced to endure extended seizures.  Upon inquiry from the court, the

---

[17]He was unsure of the number of seizures he had during March and April 2006.

plaintiff agreed that he was willing to allow the medical staff to have access to his medical/mental health records from Taylor-Hardin Secure Medical Facility and that he would participate in evaluations by a mental health specialist and a neurological consult for assessment of his situation.

Dr. Charles Hudson, the present Medical Director at the facility, testified that he recently reviewed the plaintiff's voluminous medical file.  In his medical opinion, the plaintiff is not suffering from grand mal seizures.  He voiced his concern that there is no evidence of a "true seizure disorder."[18]  He, however, is willing to arrange for a neurological consult with an outside-the-facility medical provider.  He also stated that in his opinion, the circumstances do not warrant providing the plaintiff with a helmet.  He did not feel that it was medically necessary or medically indicated.  Concerning the plaintiff's asthma condition, Hudson stated that the plaintiff was receiving medication for the asthma.  He was not critical of Dr. Breitling's treatment of the plaintiff's asthma treatment because she did not evaluate the plaintiff at a time he was experiencing the plaintiff having a wheezing episode.

Captain Richburg, who is in charge of the segregation unit where the plaintiff is housed, testified that the corrections officers perform the requisite cell checks as required every thirty minutes absent some other emergency situation.  Richburg also described the administrative process available for the plaintiff to his medical and other complaints reviewed in the segregation unit.

---

[18]Dr. Hudson premises his conclusion on the fact that the plaintiff's medical records suggest that the plaintiff is not suffering "true" seizures because of his quick recovery time and circumstances, including his ability to correctly answer questions immediately after the seizures that indicates he is oriented as to person, place, and time.  He also noted that if the plaintiff was having grand mal seizures, he would not recover the way he does when staff use the amonia capsules.  In fact, he said that the person would not react at all.  He also voiced concerns that the plaintiff may be acting out and seeking medications for secondary gain.

## DISCUSSION

After thorough consideration of all of the pertinent pleadings, documents, affidavits, exhibits, and testimony before the court, the undersigned concludes that the plaintiff has not demonstrated a need for a temporary restraining order, preliminary injunctive relief, or other preliminary relief in this matter.  The issuance of a temporary restraining order or preliminary injunctive relief is an extraordinary remedy to be granted only under exceptional circumstances. *Sampson v. Murry*, 415 U.S. 61, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974).  Motions requesting such relief must be evaluated under strict standards.  *Martinez v. Mathews*, 544 F.2d 1233 (5th Cir. 1976).  Those standards are set forth in *Parker v. State Board of Pardons and Paroles*, 275 F.3d 1032, 1033-34 (11th Cir. 2001):

> A TRO [temporary restraining order] or preliminary injunction is appropriate where the movant demonstrates that:
>
> (a)   there is a substantial likelihood that he ultimately will prevail on the merits;
> (b)   the TRO or preliminary injunction is necessary to prevent irreparable injury;
> (c)   the threatened injury outweighs the harm that the TRO or Preliminary injunction  would cause to the non-movant; and
> (d)   the TRO or preliminary injunction would not be averse to the public interest.

"Because a [TRO or] preliminary injunction is 'an extraordinary and drastic remedy, its grant is the exception rather than the rule, and [the] plaintiff must clearly carry the burden of persuasion." *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (quoting *Texas v. Seatrain International*, 518 F.2d 175, 179 (5th Cir. 1975)).  For the reasons stated below, this court finds that the plaintiff has not alleged sufficient exceptional circumstances justifying the

issuance of a temporary restraining order or other preliminary injunctive relief.[19]

### Defendants Price and Hynes

Prior to addressing each of the plaintiff's medical complaints, the court must exclude from consideration the requests for preliminary injunctive relief as to defendant Nurses Price and Hynes. A careful review of the plaintiff's allegations, the responses of defendants Hynes and Price, and the plaintiff's reply shows that the plaintiff's entire complaint against said defendants arises from the fact that he either did not receive a response or received only inadequate responses from them when he wrote grievances about nurses giving him the wrong medication, incorrect dosages, or unprofessional conduct. (See Doc. 1, pp. 15-24 & 33- 34; Doc. 24, 29, 39 & 40). In light of the information contained in the rest of this report, the court finds no basis upon which it could issue an order pertaining to emergency injunctive relief as to defendants Price and Hynes under the above-standard. Accordingly, the remainder of this report shall address the plaintiff's claims against Dr. Breitling, the nurses, and the DOC defendants.

### Asthma and Retaliation Claims

Regardless of the factual allegations presented by the plaintiff concerning his asthmatic condition, there is no longer any need for immediate injunctive relief as to that claim or any defendant associated with that claim. The plaintiff informed the court on February 3, 2006, that Dr. Breitling was no longer providing medical care to any inmate at W.E. Donaldson Correctional Facility.[20] (Doc. 47). Since Dr. Breitling is no longer providing health care

---

[19]In reaching these conclusions, the court recognizes that the plaintiff will be in the care of DOC for at least the next thirteen years due to his 2019 parole date, which is premised on his extensive criminal history.

[20]This was confirmed by the Supplemental Response to the orders to show cause which demonstrates that defendant Breitling left Donaldson about December 21, 2005, and that she does not intend to return. (Doc. 60 & 61).

treatment to the plaintiff, to the extent his motions for preliminary and permanent injunctive relief pertain to his First, Eighth, and Fourteenth Amendment claims against Dr. Breitling, they are moot.

While the plaintiff initially complained that his new physician, Dr. Hudson, did not timely reinstate his asthma care, he informed the court on March 7, 2006, that Dr. Hudson prescribed Q-Var and Albuteral inhalers for the condition.  (Doc. 59 at ¶ 10).  His only remaining asthma complaint is that he wants the Nebulizer treatment he had before Dr. Breitling discontinued this treatment.  (*Id.*).  The latter complaint constitutes a difference of opinion between the plaintiff and Dr. Hudson concerning his treatment, which does not amount to a constitutional deprivation entitling him to any relief at this juncture.  This disagreement over the asthma treatment was presented at the evidentiary hearing as the plaintiff asserted that he still wanted this treatment.

Premised on the foregoing, the court finds that the plaintiff has failed to show that he will suffer irreparable harm to warrant preliminary injunctive relief with regard to his asthmatic condition.  There is no threatened injury to the plaintiff that justifies judicial interference with the present course of conduct by prison officials.[21]  To do so would be an unjustified interference with the handling of the plaintiff's medical treatment in this area and, therefore, would be adverse to the public interest.  Accordingly, to the extent the plaintiff requests injunctive relief in any form as to any defendant regarding his asthma care claims, the same is due to be denied.  (Doc. 10, 11, & 14).

---

[21]The court notes that the plaintiff evidenced no difficulty in breathing at the hearing.  To the contrary, he appears to have adjusted to his medical situation quite well under the circumstances.

14

**Epilepsy and Retaliation Claims**

The next matter concerns the plaintiff's epileptic condition.  It has been the subject of his medical difficulties for an appreciable period of time.  The court has carefully reviewed the plaintiff's medical records from January 2005 through the present.  (Doc. 25 & 41).[22]  The court concludes from those records that while an inmate at Holman Correctional Facility between January 2005 and May 2005, the plaintiff was diagnosed as suffering from epileptic seizures and pseudoseizures.  (Doc. 25).

DOC physicians and medical staff, as well as physicians and neurosurgeons associated with private hospitals, monitored, tested, and treated the plaintiff for seizure activity several times per week and many times on a daily basis while the plaintiff was housed at Holman Correctional Facility.  (Doc. 25 & 41).  An EEG performed in February 2005, affirmatively showed abnormal activity suggestive of seizures.  (Doc. 25).  The plaintiff's seizure activity was not controllable for any significant period of time, and the various medical providers continued to try different treatments, including medications,[23] observation, front handcuffing, a helmet, and padded mattresses, in an effort to relieve the situation.  (*Id.*).  Some of these medications are dangerous, have unpleasant side effects, and their levels must be monitored and adjusted to avoid toxicity.  (*Id.*).

In addition to neurological epileptic seizure activity, the plaintiff has also been diagnosed

---

[22]The portions of the medical records cited in this memorandum opinion are not seriously disputed by the plaintiff, or if disputed, duly noted.  For instance, at the hearing, the plaintiff asked Dr. Hudson if he was aware of alterations in the plaintiff's medical records.  Hudson was not. There is no evidence that the medical records have been altered by the defendants or anyone else.

[23]The medications the plaintiff received between January and May 2005 are Dilantin, Ativan, Phenobarbital, Valium, Trazodone, Pamelor, Benadryl, Prolixin, Cogentin, Keppra, and Trileptal.

as suffering from pseudoseizures.  (Doc. 25 & 41).  Although pseudoseizures manifest

themselves in the same manner as epileptic seizures in that the patient can convulse, lose

consciousness, foam at the mouth, become incontinent, and suffer shortness of breath, they are

actually psychological in nature.  According to the American Psychiatric Association diagnostic

manual, pseudoseizures are a form of Conversion Disorder.  (*Diagnostic and Statistical Manual*

*of Mental Disorders*, Fourth Edition, Text Revision, Washington DC, American Psychiatric

Association, 2000, pp. 492-98.  ("DSM-IV-TR")).  As it pertains to epilepsy, the disorder can be

explained as follows:

> Conversion symptoms are related to voluntary motor or sensory
> functioning and are thus referred to as "pseudoneurological."  Motor symptoms or
> deficits. . . . may also include seizures or convulsions. . . .
>
> . . . . A conversion "seizure" will vary from convulsion to convulsion, and
> paroxysmal activity will not be present on an EEG.
>
> . . . . As many as one-third of individuals with conversion symptoms have
> a current or prior neurological condition.

*Id.* at pp. 493-94.  The DSM-IV-TR further explains "Conversion Disorder" in the following

manner:

> Traditionally, the term *conversion* derived from the hypothesis that the
> individual's somatic symptom represents a symbolic resolution of an unconscious
> psychological conflict, reducing anxiety and serving to keep the conflict out of
> awareness ("primary gain").  The individual might also derive "secondary" gain
> from the conversion symptom - that is, external benefits are obtained or noxious
> duties or responsibilities are evaded.  Although the DSM-IV criteria set for
> Conversion Disorder does not necessarily imply that the symptoms involve such
> constructs, it does require that psychological factors be associated with their onset
> or exacerbation.  Because psychological factors are so ubiquitously present in
> relation to general medical conditions, it can be difficult to establish whether a
> specific psychological factor is etiologically related to the symptom or the deficit.
> However, a close temporal relationship between a conflict or stressor and the
> initiation or exacerbation of a symptom may be helpful in this determination,

especially if the person has developed conversion symptoms under similar circumstances in the past.

Although the individual may derive secondary gain from the conversion symptom, unlike in Malingering or Factitious Disorder the symptoms are not intentionally produced to obtain benefits.  The determination that a symptom is not intentionally produced or feigned can also be difficult.  Generally, it must be inferred from a careful evaluation of the context in which the symptom develops, especially relative to external rewards or the assumption of a sick role. Supplementing the person's self-report with additional sources of information (e.g., from associates or records) may be helpful.

*Id*. at p. 494.

The concept of pseudoseizures, and the need for mental health treatment were discussed with the plaintiff as per the notes of treating physicians between January and May 2005.[24] Noticeably, in all of his **numerous** filings, the plaintiff has never disputed either the pseudoseizure diagnosis or his refusal to seek mental health treatment for same.[25]

With the foregoing historical background in place, the court now turns to the plaintiff's transfer to W.E. Donaldson Correctional Facility on May 18, 2005.  (Doc. 25).  Dr. Benjamin, a physician at Holman Correctional Facility, described the plaintiff as having a long history of partial complex seizures secondary to generalized seizures which had been uncontrolled.  (*Id.*). In his May 16, 2005, notes, Dr. Benjamin explained that the plaintiff was being prescribed Keppra and Phenobarbital in a prophylactic effort to subdue seizure activity.  He further noted

---

[24]The medical records before the court show that as early as 2004, health care professionals were questioning whether the plaintiff suffered from pseudoseizures.  (Doc. 25 & 41).

[25]Due to an alleged onset of paranoid schizophrenia in January 2005, the plaintiff was prescribed psychotropic medication and was to be seen monthly by a psychologist as part of a mental health plan after the January 2005 episode.  In early May 2005, the plaintiff did not appear for his psychological appointment, and the plaintiff has sought no mental health treatment since that time.  The plaintiff denies he is a paranoid schizophrenic or that he needs mental health assistance.  However, older medical records show that the plaintiff wrote and signed a letter to corrections officials stating that he was hearing voices to tell him to hurt himself or others, and that he desired assistance.

At the hearing on the motions, the plaintiff again stated his concerns and reluctance to taking any type of psychotropic medication, particularly if it is prescribed by a medical doctor associated with the prison system.

that it was typical for the plaintiff to have multiple visits to the infirmary of two to three times per week.  (*Id*.).  The plaintiff was occasionally incontinent, postictal, and wore a helmet on his head to prevent trauma.  (*Id*.).  Dr. Benjamin suggested that the plaintiff be placed on Trileptal, another type of epileptic medication, for a trial period.  (*Id*.).

On May 18, 2005, the plaintiff arrived at Donaldson Correctional Facility with anti-convulsant and asthma medication, and instructions that he be front cuffed, wear a helmet, and have a mat in his room.  After midnight, the plaintiff appeared to have a grand-mal type seizure and was transferred to Princeton Hospital in Birmingham, Alabama.  He was returned to the prison the next day, where it is recorded that the transporting DOC officials informed medical staff that the doctors at Princeton Baptist Hospital stated the plaintiff was faking his symptoms.[26] The plaintiff was monitored in Donaldson's infirmary until May 24, 2005, when he was released to a segregation cell.

On June 17, 2005, Dr. Boone, a physician at Carraway Methodist Hospital in Birmingham, explained to the plaintiff the nature of pseudoseizures, that some of the plaintiff's seizure activity was psychological and that it could be attributed to heat and stress.  However, the plaintiff refused to seek psychological assistance.  At that time, the plaintiff's Trileptal prescription and helmet were discontinued and he received a psychological referral.

Between July 7, 2005, and August 10, 2005, the plaintiff's seizure activities twice caused him to injure his head, resulting in hematomas.  (Doc. 25 & 41).  During this time period, the

---

[26]The medical records concerning these findings are not as clear as suggested by the report of the medical defendants. First, Drs. Bilbrew and Allison, physicians with the University of South Alabama, diagnosed the plaintiff as suffering from pseudoseizures on or about April 26, 2005.  Second, contrary to the defendants' report, Dr. Bilbrew did not state that the plaintiff was faking.  However, PHS Infirmary Nursing Progress Notes dated May 1, 2004 (not from May 2005), indicate that while the plaintiff was at Kilby Correctional Facility, prison staff were informed by a nurse at the Baptist South Emergency Room that the plaintiff "was not having seizures.  He is malingering.  He can have pseudoseizures in his cell."

18

plaintiff was transferred to outside hospitals, and then back to the prison infirmary, where records show he received medical attention on almost a daily basis up through the end of August 2005. (*Id*.).  During this time period, the plaintiff was still being administered his anti-convulsant medications, Keppra and Phenobarbital.  These medications were continued through October 18, 2005, when blood tests revealed non-therapeutic levels of the drugs in his system, indicating that the plaintiff was not taking the medication given to him.  (Doc. 41, Ex. 2; Doc. 30, Riggins Second Aff. at p. 2).  Still, the plaintiff was monitored in the infirmary for the last week of September 2005; from October 12, 2005, to October 21, 2005; and, from November 5, 2005, to November 10, 2005.  (Doc. 41, Ex. 1 & 2).  Some seizure-like activity was noted during this time period.  The plaintiff also complained up to the end of December 2005 that he was being allowed to seize in his cell, and that he was transported to a private hospital on December 10, 2005, for shoulder and back injuries pertaining to a seizure event.  (Doc. 46).  Following his return to the institution, he asserts that he was "physically and verbally assaulted by both D.O.C. officials and P.H.S. nurses" following another medical incident.  (*Id*. at p. 1).  He further asserts that he was "maliciously and sadistically" treated, causing "severe pain" while he was handcuffed and assaulted with pepper spray.  (*Id*.).  He also states that he was "kicked and beat [sic] with sticks." (*Id*.).

Additionally, while the plaintiff still blames Dr. Breitling for discontinuing his seizure medication, on March 6, 2006, he admitted that he "is presently being treated for severe migraine headaches and other medical problems . . ." due to injuries sustained as a result of the deliberate indifference to his seizures.  (Doc. 58 at ¶ 6).

The plaintiff has not shown he will suffer any irreparable injury if the injunctive relief he

requests is not granted.  The plaintiff suffers from complicated neurological and psychological difficulties, for which medical professionals have evaluated and recommended medical and psychological treatment on a continuous basis.  The plaintiff's seizures were uncontrolled even while he was heavily medicated (some of which can be extremely toxic) and afforded health benefits.  It was only after months of continuous observation, testing, and treatment that medical decisions were made to systematically withdraw various health benefits and medications from the plaintiff.

Although it appears the plaintiff's seizure activity caused him injury in 2005 and he has stated that he has had recurring episodes on a monthly basis in 2006, the plaintiff does not make any specific claims against his new DOC physician, Dr. Hudson, regarding same.  Additionally, until the recent hearing, the record shows that the plaintiff has also refused to accept mental health treatment for that portion of his illness which maybe psychological as he has been advised to do.  At the hearing, the plaintiff agreed that he would participate in an evaluation of his mental health.  This should allow for the further medical treatment of his situation.  The mental and medical health providers have agreed to work with the plaintiff to see that the necessary evaluations are conducted.  For the foregoing reasons, the court does not find that the threatened injury the plaintiff outweighs the adverse impact to the public interest in affording prison officials the ability to control and direct the administrative aspects of prison affairs, as well as the safety of the plaintiff, so as to warrant preliminary relief.  It follows that to the extent the plaintiff demands injunctive relief from DOC officials and Wardens Jones, McDonnell, and Huntley, Captain Richburg, Supervisor Clark, and Officer Melvin Wilson[27] the same is due to be denied to

---

[27]These defendants filed affidavits denying the plaintiffs' allegations.  (Doc. 20, Ex. 8-13A).

the extent he asserts that they have failed to intervene on his behalf regarding his medical care. (Doc. 1, 4, & 5).

### Retaliation by DOC Officials

The plaintiff claims that between September 23, 2005, and September 28, 2005, DOC defendants Ryans, Carter, Richburg, Hawkins, Clark, and Wilson threatened to cause him mortal bodily harm if he continued to pursue his lawsuit against them.  (Doc. 14 at p. 2).  He also claims that defendant Ryans and two other unidentified officers threw him to the concrete floor on September 23, 2005, and that on September 26, 2005, defendants Clark, Richburg, and Carter confiscated his legal work.  He demands a temporary restraining order against them.  Said defendants deny all of the plaintiff's allegations.  (Doc. 20 at Ex. 1-7).

The plaintiff also states that defendant Carter continually shakes down his cell and threatens to cause him bodily harm.  (Doc. 46, Third Riggins Aff. at p. 2).  Additionally, on November 23, 2005, defendant Ryans allegedly squeezed his arms painfully and threatened to kill the plaintiff in or out of his handcuffs.  (*Id*.).  The plaintiff further claims that unidentified officers peppered sprayed and beat him with sticks in December 2005.  (Doc. 46, First Riggins Aff. at p. 1).  The plaintiff has also submitted the affidavit of inmate Carl Hupp on February 21, 2006, in support of his claim that defendant Carter assaulted him and shakes down his cell. (Doc. 54).

Accepting the plaintiff's allegations at this juncture, the court is troubled by the allegations concerning Carter and Ryans, however, the undersigned is not satisfied that the plaintiff has demonstrated the necessity of injunctive relief at this time.  Although their purported conduct would be inappropriate, serious, and menacing, the court is satisfied that judicial

21

intervention is unnecessary.  The plaintiff can file a grievance against any DOC personnel involved in inappropriate conduct.  The record amply demonstrates that he has been able to frequently and effectively communicate with the court despite any purported efforts by any correctional personnel.  Should he experience any similar conduct in the future, the court should be notified to further evaluate the need for appropriate action.

## CONCLUSION

Accordingly, for the reasons stated above, the undersigned finds that the plaintiff's motions for a temporary restraining order, declaratory judgment, and injunctive relief (doc. 1, 4, 11, 14, 29, 43, 45, 48, 49, 55, & 58) are due to be denied.  The plaintiff's motions to amend (doc. 27, 28, & 52) will be granted.  Defendant Breitling's motion to strike (doc. 31) is due to be denied without prejudice.  To the extent the plaintiff again requested the appointment of counsel at the evidentiary hearing, the motion is denied.[28]  To the extent that the defendants seek "final" summary judgment on the plaintiff's claims in their responses and other pleadings (doc. 20, 23, 25 & 62), the motions are denied at this juncture.  An appropriate order will be entered consistent with the court's findings and conclusions.

The Clerk is **DIRECTED** to send a copy of this memorandum opinion to the plaintiff and counsel for defendants.

**DONE**, this 24th day of July, 2006.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge

---

[28]The court remains satisfied that the plaintiff is able to effectively communicate his claims and supporting evidence to the court.