FILED
2008 Sep-11  AM 09:10
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| DARRYL RIGGINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )        2:05-CV-1915-JEO |
| | ) |
| HEAD WARDEN KENNETH JONES, | ) |
| WARDEN TERRANCE MCDONNELL, | ) |
| WARDEN RODNEY HUNTLEY, | ) |
| CAPTAIN JIMMIE RICHBURG, | ) |
| LT. KENNETH CLARK, | ) |
| LT. MELVIN WILSON, | ) |
| CORRECTIONAL OFFICER RONALD | ) |
|     HAWKINS,[1] | ) |
| SGT. RONALD CARTER, | ) |
| SGT. WILLIE RYANS, | ) |
| SGT. WALLACE PETERSON, | ) |
| DR. MELISSA BREITLING | ) |
| DR. CHARLES HUDSON[2] | ) |
| BETTY ROGERS, L.P.N., | ) |
| RALPH PRICE, R.N., and | ) |
| H.S.A. LAWRENCE HYNES,[3] | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

### Table of Contents

I.      BACKGROUND................................................................................................. 3

        A.      Generally................................................................................................ 3
        B.      Remedy at Issue..................................................................................... 4
        C.      Procedural History................................................................................. 5
        D.      Construction of Plaintiff's *Pro Se* Pleadings.................................... 8
        E.      Factual Background................................................................................ 9

                1.      Claims of Deliberate Indifference to Medical Needs.......................... 10
                        a.      Original Complaint.................................................... 10
                        b.      Pre-Hearing Allegations............................................. 11
                        c.      Post-Hearing Allegations........................................... 14

                2.      Retaliation, Infliction of Pain, and Deprivation of Access to Courts..15

---

[1] Hawkins is also referenced in the pleadings as R.L. Hawkin.

[2] Hudson is also referenced in the pleadings as Huddson.

[3] Hynes is also referenced in the pleadings as Hines.

|  |  | a. | Pre-Hearing Allegations | 15 |
|  |  | b. | Post-Hearing Allegations | 17 |

**F.** Summary Judgment Standard........................................................................ **18**

**II.** DISCUSSION.................................................................................................. **20**

    **A.** The Plaintiff's Claims of Inadequate Medical Treatment............................ **20**

        **1.** Claims Against Dr. Breitling.................................................. **22**

            **a.** Inadequate Treatment of Seizures..................... **23**

            **b.** Inadequate Treatment of Asthma....................... **26**

            **c.** Infliction of "Wanton and Cruel Pain"............. **28**

            **d.** Missed Appointments........................................ **29**

        **2.** Claims against the Medical Defendants.................................. **31**

        **3.** Medical Claims against the Corrections Defendants.............. **33**

            **a.** Delayed Medical Care....................................... **34**

            **b.** Inadequate Supervision of Inmates.................... **36**

            **c.** Interference and Indifference to Medical Care.... **37**

        **4.** Medical Claims Conclusion.................................................. **39**

    **B.** The Plaintiff's Claims of Wanton and Unnecessary Infliction of Pain......... **40**

        **1.** Sgt. Ryans............................................................................ **40**

        **2.** Sgt. Carter............................................................................ **41**

    **C.** The Plaintiff's First Amendment Claims.................................................... **42**

        **1.** Deprivation of the Plaintiff's Right to Access the Courts................... **42**

        **2.** Retaliation for the Plaintiff's Exercise of his Right to Access the Courts................................................................................ **43**

            **a.** Threats............................................................. **44**

            **b.** Assault............................................................. **45**

            **c.** Inadequate Medical Care and Conditions of Confinement.... **47**

    **D.** Qualified Immunity.................................................................................. **48**

    **E.** The Plaintiff's Claims Post-Dating the July 18, 2006 Evidentiary Hearing.. **49**

        **1.** November 20 and June 15 Allegations................................... **50**

        **2.** Post-Order Allegations......................................................... **51**

**III.** The Plaintiff's Other Pending Motions.......................................................... **52**

**IV.** CONCLUSION.............................................................................................. **53**

## I.    BACKGROUND

### A.    Generally

Plaintiff, Darryl Riggins (hereinafter "the plaintiff" or "Riggins"), is an inmate in the

Alabama penal system previously incarcerated at the William E. Donaldson Correctional Facility

(hereinafter "WEDCF").  On September 12, 2005, the plaintiff filed this *pro se* action pursuant to

42 U.S.C. § 1983.  (Doc. 1).[4]  He alleges that he has been deprived of rights, privileges, or

immunities afforded him under the Constitution or laws of the United States of America.  (Doc.

1).  The plaintiff names the following defendants: Warden Kenneth Jones, Warden Terrance

McDonnell, Warden Rodney Huntley, Capt. Jimmie Richburg, Lt. Kenneth Clark, Lt. Melvin

Wilson, Officer Ronald Hawkins, Dr. Melissa Breitling, Ralph Price, R.N., HSA Lawrence

Hynes, Sgt.Willie Ryans,[5] Sgt. Ronald Carter, Sgt. Wallace Peterson, Betty Rogers, L.P.N., and

Dr. Charles Hudson (Doc. 1, 9 & 52).[6]  While the complaint names these defendants with their

official titles, plaintiff has brought suit against these defendants individually.  (*See* Hearing

Transcript).

---

[4]References herein to "Doc. ___" are to the document numbers assigned by the Clerk of the Court.

[5]The court was notified that Sgt. Willie Ryans died on January 5, 2007.  Prior to his death, Sgt. Ryans had prepared and signed affidavits regarding the charges the plaintiff made against him.  These affidavits were included with the special reports of the ADOC defendants.  (Doc. 20 & 86).

[6]Warden Jones, Warden McDonnell, Warden Huntley, Capt. Richburg, Lt. Clark, Lt Wilson, Officer Hawkins, Sgt. Ryans, Sgt. Carter, and Sgt. Peterson may hereinafter be referred to as the "corrections defendants." Ralph Price, Lawrence Hynes, Betty Rogers, and Dr. Hudson may hereinafter be referred to as the "medical defendants."  Dr. Breitling will be referred to separately.

Defendants Jones, McDonnell, Huntley, Richburg, Clark, Wilson, Breitling, Price, and Hynes were named in the original complaint.  (Doc. 1).  Defendants Ryans, Carter, Peterson, Rogers were added in an amendment, (Doc. 27).  Dr. Hudson was also added in a later, separate amendment.  (Doc. 52).  Nurse Smith was added in an amendment (doc. 27), but the court later dismissed all claims against her upon oral motion of the plaintiff (*See* Hearing Transcript (doc. 76)).

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(2), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136, 111 S. Ct. 1737, 114 L. Ed. 2d 194 (1991). However, on July 18, 2006, all parties consented to the undersigned Magistrate Judge's jurisdiction. (Doc. 65).

Before the court are the special reports of the defendants (Doc. 20, 25, 86, 88, 97 & 100) which the court is construing as motions for summary judgment. (*See* Doc. 84). For the reasons stated below, the court finds that the defendants' Motions for Summary Judgment are due to be denied in part and granted in part. Also before the court are the various other pending motions filed by the plaintiff (Doc. 72, 78, 94, 95, 99, 101, 102, 115 & 120). Upon consideration, the court finds that some are moot, and others are due to be granted or denied.

### B.    Remedy at Issue

As compensation for the alleged constitutional violations, the plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief. (Doc. 1). However, because the plaintiff has been transferred to a another prison (doc. 118), the issue of injunctive relief is moot. *See Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) ("Absent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred."). So, while the court will outline the procedural history relating to the plaintiff's requests for injunctive relief, the only issue left for the court to consider here is whether the plaintiff's claims for damages are sufficient to overcome the defendants' motions for summary judgment.

### C.     Procedural History

In his original complaint, filed on September 12, 2005, the plaintiff states that he suffers from uncontrollable seizures and that he was issued a helmet to wear to prevent head injuries during those seizures while he was incarcerated at Holman Correctional Facility ("Holman").  He further states that the helmet was taken from him when he was transferred to the WEDCF.  (Doc. 1).  Along with this complaint, the plaintiff contemporaneously filed a motion for appointment of counsel (doc. 2), which was denied (doc. 6), and a motion for preliminary injunctive relief  (doc. 4).  In the motion for a preliminary injunction, the plaintiff asked the court to order the defendants to return his helmet, place him in a padded cell in the segregation unit to prevent further injury during his seizures, and order adequate observation of him.  (Doc. 4).  On September 21, 2005, the court issued an order, directing the defendants to respond to the plaintiff's complaint, with regard to the motion for preliminary injunction.  (Doc. 8).

Before the defendants responded to the court's order, the plaintiff filed several documents immediately following the court's order.  One of those documents was filed on September 26, 2005, when he submitted a personal affidavit in which he accused Dr. Breitling of failing to treat him for asthma and missing scheduled appointments.  (Doc. 10).  On the same day, the plaintiff filed a "Motion for Relief by Declaratory Judgment," reiterating his medical claims.  (Doc. 11).

On October 3, 2005, plaintiff filed a "Motion for Imediate [sic] Temptery [sic] Restrainting [sic] Order."  (Doc. 14).  In the motion, the plaintiff accuses defendants Richburg, Ryans, Carter, Hawkins, Clark, and Wilson of verbally threatening him in retaliation for bringing this suit and also alleges that Ryans and two other officers threw him to the floor, causing the right side of his face to swell.  (Doc. 14).  Since the court has construed documents 10, 11 and 14

5

as motions to amend the complaint, which were granted (doc. 16), the court must construe document 14 as adding claims of retaliation against the articulated corrections defendants, as well as a general Eighth Amendment claim—alleging wanton and unnecessary infliction of pain—against Ryans.

Pursuant to the court's previous order to respond to the plaintiff's complaint (doc. 8), the defendants filed special reports, medical records, and affidavits. (Doc. 20 & 22-25). On November 21, 2005, and July 3, 2006, the plaintiff filed responses to the defendants' special reports. (Doc. 36, 64). On December 12, 2005, the plaintiff filed a "Motion for an Emergency Temporary Restraining Order" wherein he again stated that he was threatened by corrections officers because of this suit and that Sgt. Ryans again assaulted him in retaliation for the same. (Doc. 43). On the same day, the plaintiff also filed a motion for summary judgment. (Doc. 45), which was denied. (Doc. 67).

The plaintiff also has filed numerous personal affidavits (docs. 30, 33-35, 39, 40, 46, 50, 51 & 53); a "Declaration under Penalty of Perjury" (doc. 59); and affidavits of two fellow inmates, Abd-Salaam Nuba Amun[7] and Carl Hupp (doc. 35 & 54), supporting some of his claims. Because of the seriousness of the plaintiff's allegations, the court ordered a hearing.

On July 18, 2006, an evidentiary hearing was held at WEDCF for the limited purpose of determining whether the plaintiff was entitled to injunctive relief. (Doc. 25). Dr. Charles Hudson, the then current Medical Director at WEDCF, testified at the hearing about the plaintiff's medical history and the treatment provided him. (Hearing Transcript). Dr. Hudson testified that based on his observations of the plaintiff and a review of his medical record, it was

---

[7]Amun changed his name from Earl Cunningham II. (*See* Doc. 35).

6

his opinion that the plaintiff was not suffering from a true seizure disorder.  (*Id.*).  Also, Capt. Richburg testified about what measures corrections officers took to patrol, observe, and care for inmates at the WEDCF. (*Id.*).  After considering the testimony at the hearing, the undersigned magistrate judge entered a memorandum opinion on July 24, 2006, in which the plaintiff's motion for a preliminary injunction was denied.  (Doc. 66).

On November 20, 2006, the plaintiff filed a pleading entitled "Factual Allegations," containing new accusations that WEDCF officers who were never named as defendants, Officers Freeman and Groce, physically assaulted him and that Officer Witherspoon knew of this assault and allowed it to proceed.  (Doc. 78).  The plaintiff also filed an affidavit supporting those accusations.  (Doc. 79).  The court has construed document 78 as a motion to amend.

On July 16, 2007, the court entered an order denying the plaintiff's motions for injunctive relief, directing the defendants to review the documents previously forwarded to them, and requesting that they file a special report addressing the factual allegations of plaintiff's complaint.  (Doc. 84).  The defendants were advised that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, would be considered as a motion for summary judgment filed pursuant to FEDERAL RULE OF CIVIL PROCEDURE 56. (*Id.*).  By the same order, the court directed that the plaintiff could not further amend the complaint, then over twenty-two months old, absent a showing of good cause.  (*Id.*).  The plaintiff was also advised that after he received a copy of the special report submitted by the defendants, he was permitted to file affidavits to rebut the matters presented by the defendants in the special report.  (*Id.*). The plaintiff was further advised that such affidavits should be filed within twenty (20) days after receiving a copy of the defendants' special report.  (*Id.*).

7

On August 15, 2007, a special report was filed by the correctional officers accompanied by the affidavits of defendants Clark, Wilson, Richburg, Ryans, Carter, Huntley, and Peterson, along with applicable portions of the plaintiff's medical records. (Doc. 86). Dr. Breitling also filed a special report on August 15, 2007, accompanied by affidavits and copies of applicable portions of plaintiff's medical records. (Doc. 88). On September 6, 2007, and October 5, 2007, the medical defendants filed supplemental special reports and attached the affidavits of Dr. Charles Hudson and Betty Rogers. (Docs. 97 & 100).

Thereafter, the plaintiff was notified that he would have twenty days to respond to the motions for summary judgment, filing affidavits or other material if he chose. The plaintiff was advised of the consequences of any default or failure to comply with FEDERAL RULE OF CIVIL PROCEDURE 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). In response, the plaintiff filed numerous affidavits containing personal testimony and other documents, including a motion to amend, another "Motion for a Temporary Restraining Order, and affidavits of fellow inmates Earnest Arrington, Dennis Altman, and Robert Johnson, responding to the defendants' Special Reports. The plaintiff also included some new allegations, describing events that post-date the July 18, 2006, evidentiary hearing. (Doc. 96, 103, 104, 112, 114 & 117). In addition, the plaintiff filed a response to the defendant's motion for summary judgment and a discovery request. (Doc. 99 & 110). On March 8, 2008, the plaintiff filed a notice of address change to another ADOC facility in Atmore, Alabama.

### D.    Construction of the Plaintiff's *Pro Se* Pleadings

The United States Supreme Court has ruled on numerous occasions that a "handwritten *pro se* document is to be liberally construed." *E.g., Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.

Ct. 285, 292, 50 L. Ed. 2d 251 (1976); *Erickson v. Pardus*, ___ U.S. ___, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007). A court is required to hold a *pro se* complaint, "however in artfully pleaded," to "less stringent standards than formal pleadings drafted by lawyers." *Estelle*, 429 U.S. at 106 (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972)). Pleadings are to be construed to do substantial justice. FED. R. CIV. P. 8(f). Furthermore, the Supreme Court has stated that federal courts may "ignore the legal label that a *pro se* litigant attaches to a motion and recharacterize the motion in order to place it within a different legal category." *Castro v. United States*, 540 U.S. 375, 381, 124 S. Ct. 786, 791, 157 L. Ed. 2d 778 (2003). The Court also held that the rule was designed to "avoid inappropriately stringent application of formal labeling requirements, or to create a better correspondence between the substance of a *pro se* motion's claim and its underlying legal basis." *Castro*, 540 U.S. at 381-82 (internal citations omitted). These rulings are consistent with the Eleventh Circuit's holding providing "*pro se* parties . . . wide latitude when construing their pleadings and papers. When interpreting . . . *pro se* papers, the Court should use common sense to determine what relief the party desires." *S.E.C. v. Elliot*, 953 F.2d 1560, 1582 (11th Cir. 1992) (internal citations omitted).

Therefore, this court will construe the plaintiff's filings liberally, drawing all factual inferences in favor of the plaintiff. *Id.*

### E.     Factual Background

#### 1.     Deliberate Indifference to Medical Needs

##### a.     Original Complaint

The plaintiff filed his § 1983 action on September 12, 2005. He complains about the

medical care at the WEDCF since his transfer from Holman on May 18, 2005.  (Doc. 1).  The

plaintiff states that he was diagnosed as suffering from a seizure disorder for which he was

prescribed numerous medications.  (*Id*.).  While at Holman, the plaintiff was also given a

baseball helmet to wear to prevent head injuries during a seizure.  (*Id*.).  On June 17, 2005, after

his transfer to WEDCF, Dr. Melissa Breitling took the plaintiff's helmet away from him.  (*Id*.).

On July 7, 2005, the plaintiff had a seizure and suffered a head injury at WEDCF.  (*Id*.).

On the same day, the plaintiff requested his helmet, but Dr. Breitling refused his request. (*Id*.).

The plaintiff also complains that the corrections defendants failed to respond adequately to his

"serious medical needs."  On July 9, 2005, the plaintiff had another seizure.  (*Id*.).  He alleges

that Officer Hawkins saw him having this seizure, but waited thirty minutes before getting any

medical help.  (*Id*.).  In addition to failing to render medical assistance when needed, the plaintiff

alleges that on August 9, 2005, defendants Jones, Huntley, Richburg, Clark, and Wilson told the

doctor to discontinue "certain medical need profiles."  (*Id*.).  Also, the plaintiff claims that he has

been told by defendants Jones, Richburg, Clark and others that "they don't care or have to give

[the plaintiff] medical treatment."  (*Id*.).

Moreover, the plaintiff alleges that various defendants have been non-responsive to his

inquiries, both medical and administrative.  For instance, on August 16, 2005, the plaintiff had an

appointment with Dr. Melissa Breitling, but she "refused" to see him and continued to refuse to

see him.  (*Id*.).  He sent written complaints about these events to, *inter alia*, defendants

McDonnell, Jones, Huntley, Richburg, Clark, Wilson, Price, and Hines; however, the plaintiff

allegedly received no response.  (*Id*.).

The plaintiff also alleges in his original complaint that his head injuries that occurred

during his seizures on July 7, July 9, and August 9, 2005, were due to the defendants' deliberate indifference and ongoing policy and custom of rendering inadequate medical care. (*Id*.). The court has construed this as a claim under 42 U.S.C. § 1983.

**b.      Pre-Hearing Allegations**

In additional pleadings (doc. 10 & 11) which the court considered as amendments to his initial complaint,[8] the plaintiff claims that Dr. Breitling further interfered with his "serious medical needs" by denying him proper treatment for asthma. (Doc. 10). The plaintiff states that he has suffered from asthma since childhood and has been treated with Albuterol, Combivent and Q-VAR. (*Id*.). However, according to the amendments to the complaint, Dr. Breitling stopped prescribing inhalers for the plaintiff in August 2005. (*Id*.). Furthermore, he alleges that Dr. Breitling refused to see him after he had appointments to see her on August 16, 2005, and September 13, 2005. (*Id*.).

On October 3, 2005, the plaintiff filed a "Motion for Immediate Temporary Restraining Order," alleging that on September 16, 2005, another doctor prescribed nebulizer treatments for the plaintiff, but Dr. Breitling discontinued them on September 26, 2005. (Doc. 14). The plaintiff maintains that he needed the medication and inhalers to breathe and that Dr. Breitling denied him adequate medical care by discontinuing them. (*Id*.).

The plaintiff also alleges that corrections officers have delayed and interfered with his medical treatment. Earnest Arrington, a fellow inmate housed in an adjacent cell to the plaintiff, submitted an affidavit in support of these allegations on December 3, 2007. (Doc. 112).

---

[8]The court also construed plaintiff's document 14, "Motion for Immediate Temporary Restraining Order," as a supplemental complaint. (Doc. 14).

Arrington states that he heard the plaintiff suffer a seizure on August 20, 2005.  (*Id*.).  Arrington

contends that he called for help, but it took Officer Peterson and medical staff twenty or thirty

minutes to arrive.  (*Id*.).  According to Arrington, after corrections officers and a nurse arrived,

Officer Peterson instructed the nurse to "leave his ass right there, he ain't going no where."  (*Id*.),

Then Officer Peterson and the nurse left – apparently without providing plaintiff medical care.

(*Id*.).

On October 31, 2005, the plaintiff filed a motion to amend the complaint which was

granted by this court.  (Doc. 27).  The motion alleges that Sgt. Ryans has "intentionally interfered

with medical treatment and special needs treatment."  (*Id*.).  In addition, the plaintiff's motion

alleges that on August 9, 2005, Ryans went to Dr. Breitling and had her discontinue a "special

needs order" that required officers cuff plaintiff's wrists in front instead of behind his back.  (*Id*.)

He alleges that Sgt. Carter "played a part in requesting Doctor [Breitling] to [sic] discontinue

n[e]bulizer treatments."  (*Id*.).  Finally, in this motion to amend, the plaintiff alleges that on

August 23, 2005, Nurse Rogers stopped the plaintiff's breathing treatments, refused to give him

medication, and ejected him from the infirmary.  (*Id*.).

The plaintiff filed another affidavit on December 21, 2005, wherein he denies suffering

from any mental illness and being a malingerer as Dr. Breitling alleges.  (Doc. 32).  He also

states that medical records fail to show otherwise.  (*Id*.).  The plaintiff further alleges that on

August 17 and 23, 2005, he was having trouble breathing.  (*Id*.).  He states that on August 23,

2005, his oxygen level was low – 72%.  He does not state how he is aware of this exact

percentage.[9]  (*Id*.).

---

[9]However, nurse's progress notes for the same day state that plaintiff's oxygen saturation was 98%.

Next, he contends that Officer Hawkins refused to allow Dr. Breitling in his cell on

August 27, 2005, and that later that day officers told him Dr. Breitling did not want to see him.

(*Id*.).  He states that the officers explained that Dr. Breitling had seen him earlier that day, but the

plaintiff contends that this is false.  (*Id*.).

On November 21, 2005, the plaintiff filed two affidavits.  (Doc. 33 & 34).  In the first

affidavit, the plaintiff claims that he informed Warden Huntley, Capt. Richburg, and Lt. Clark

that the medication he had been given was incorrect, but none of the officers corrected what the

plaintiff believed was a medical error.  (Doc. 33).  In the second affidavit, the plaintiff claims that

he has received only one response from H.S.A. Price after filing numerous medical complaints.

(Doc. 34).

The plaintiff filed a number of affidavits on February 21, 2006.  In one, he alleges that Dr.

Breitling had not seen him on his scheduled December 12, 2005 appointment, that he continues

to suffer from headaches because of his seizing on the "hard concrete floor", and that he worries

that his neighboring inmates in his new segregation unit are too "drugged up" to know to call for

help if he has a seizure.  (Doc. 46).  In another February 21, 2006, affidavit, the plaintiff alleges

that officers at WEDCF continue to leave him in his cell to seize because officer patrols are too

infrequent.  (Doc. 50).

In yet another February 21, 2006, affidavit, the plaintiff claims that he reported to

Officers J. Watson and R. Williams that he was having an asthma attack on January 10, 2006.

(Doc. 51).  Officer Williams told the plaintiff to wait and returned about twenty minutes later

with an inhaler from the infirmary.  (*Id*.).  The plaintiff complained that it was not the one he

needed and refused to take any medication from him telling him it was because Williams was not

13

medically trained.  (*Id.*).  Williams returned about thirty minutes later and told the plaintiff that they did not want to see him in the infirmary at that time.  (*Id.*).  The plaintiff asked to see a supervisor.  (*Id.*).  Officer Melvin Wilson came to see the plaintiff and some time later he was taken to the infirmary.  (*Id.*).  The plaintiff asserts that, when he arrived at the infirmary, Nurse Robinson, who has not been named as a defendant, observed him wheezing but refused to provide him with any treatment and sent him back to his cell. (*Id.*).

The court is construing these February 21, 2006, affidavits as part of the plaintiff's February 21, 2006, motion to amend, which was granted.  (Doc. 52).  This results in the adding of Dr. Hudson as a defendant because, as the amended complaint alleges, he "did . . . knowingly show deliberate indifference when he discontinued [the p]laintiff['s] asthma medication afer he knew [the] plaintiff was in dire need of medication for his serious medical need."  (*Id.* at ¶ 3).

On March 16, 2006, the plaintiff filed a "Declaration under Penalty of Perjury" in which he alleges that despite Dr. Hudson's admission that the plaintiff suffers from asthma on February 21, 2006, the doctor still refused to give him nebulizer treatments twice a day and a combivent inhaler which he believes is the proper treatment.  (Doc. 59 at ¶ 10).

### c.    Post-Hearing Allegations

After the court ordered that no further amendments would be allowed absent a showing of good cause and that no further discovery will be ordered (doc. 84), the plaintiff filed a motion for leave to file an amended complaint (doc. 102).  This motion asserts that Theophylline tablets prescribed for the plaintiff by the doctors "were not dissolving but passing through his bowels whole."  (*Id.*).  He also asserts that he had been forced to undergo surgery.  (*Id.*).  He further alleges that Nurse Henderson, who has never been named as a defendant or otherwise mentioned,

stated on September 29, 2007, that she would refuse to give the plaintiff breathing treatments even if the doctor ordered it.  (*Id*.).  Nurses Bachlor and Hatchworth, who were also not previously named as defendants, also are alleged to have refused to give the plaintiff breathing treatments.  (*Id*.).  The plaintiff next alleges that Officer Robinson turned his breathing treatments off and told him to leave the infirmary while the plaintiff was still "wheezing and in distress."  (*Id*.).  Lt. Gilbert, a corrections officer who is not a named defendant, and Nurse Rogers purportedly watched this "violation" of the plaintiff's rights and refused to help.  (*Id*.).  The plaintiff filed an affidavit reciting these facts on the same day that the motion to amend was filed, October 11, 2007.  (Doc. 103).

The plaintiff claims that he has suffered "prolonged and extreme pain and unnecessary complications . . ." as a result of the defendants' deliberate indifference to his medical needs.  (Doc. 1 at ¶ 9 under "Inadequate Medical Care").  The plaintiff maintains that he now has permanent scarring on the back of his head, uncontrollable shaking and twitching on the left side of his body, and frequent headaches.  (Doc. 1 at ¶ 10 under "Inadequate Medical Care").

### 2.   Retaliation, Infliction of Pain, and Deprivation of Access to Courts

In addition to the plaintiff's original allegations of constitutionally inadequate medical care, he also alleges that the defendants have retaliated against him for filing this suit.  (Doc. 14).  He also generally alleges that Sgt. Ryans inflicted wanton and unnecessary pain on him.  (*Id*.).  These allegations were not presented in the original complaint.

### a.   Pre-Hearing Allegations

Adding to his allegations that the defendants delayed and interfered with the plaintiff's medical needs, Earnest Arrington's affidavit is offered in support of the plaintiff's general claims

15

of an Eighth Amendment violation.  Arrington asserts that he called for help for the plaintiff on September 23, 2005, when plaintiff had another seizure.  (Doc. 112).  Arrington further states that it took 45 minutes to get anyone inside plaintiff's cell to help him.  (*Id*.)  This time, Arrington alleges that when Officers Freeman, Bolling, and Ryans lifted the plaintiff on the stretcher, Officer Ryans instructed the other officers to "drop his ass."  (*Id*.).  Arrington then alleges that "they all slammed Riggins to the hard cement floor."  (*Id*.).

Arrington also supports the plaintiff's claim that on November 23, 2005, Officer Ryans physically grabbed and twisted plaintiff's arms in an extremely painful position.  (*Id*.).  Specifically, Arrington claims that Ryans taunted the plaintiff and threatened to kill him.  (*Id*.)

Arrington further supports plaintiff's allegations that defendants Jones, Richburg, and Carter took legal books and other personal belongings from the plaintiff's cell.  (Doc. 50 & 112).  Arrington states that he has witnessed "several D.O.C. [Department of Corrections] officials threaten Riggins and go into Riggins cell and take his properties [sic] for no reason."  (*Id*.).  He also claims that Officer Carter "would have Riggins' cell ramshackled [sic] and torn up almost everyday and then take Riggins properties."  (*Id*.)

The affidavit of Carl Hupp also supports the accusations that officers took the plaintiff's property, and adds the claim that Sgt. Carter physically assaulted the plaintiff.  (Doc. 54).  Hupp states that he witnessed Carter "physically push, punch and shove" the plaintiff.  (Doc. 54).  The plaintiff's affidavit states that Carter "keeps physically assaulting me and threatens to kill me if I buck while they shake my cell down."  (Doc. 50).

On December 12, 2005, the plaintiff filed a motion for an emergency temporary restraining order against the defendants.  (Doc. 43).  In this motion, he claims that he was

physically assaulted by Sgt. Ryans on November 23, 2005.  (*Id*.).  He also claims that Ryans threatened to kill him if he continued with his lawsuit.  (*Id*.).  In an affidavit filed on February 23, 2006, the plaintiff expands on this accusation, stating that Sgt. Ryans took his arms and twisted them despite the plaintiff's pleas to stop.  (Doc. 46).  The plaintiff also states that he was seriously injured and received a number of marks from the assault, but Sgt. Ryans refused to give him a body chart to record his injuries.  (*Id*.).

In a February 21, 2006, affidavit, the plaintiff further alleges that on December 10, 2005, he suffered a seizure and was found unconscious with injuries to his right shoulder and elbow. (Doc. 46).  He claims that they sent him to Carraway Hospital and, when he returned to WEDCF, he was physically assaulted by unnamed corrections officers and nurses at the infirmary, dragged out of the infirmary by officers, and then sprayed in his open mouth and face with pepper spray. (*Id*.).

In the same affidavit, the plaintiff alleges that staff at WEDCF read his outgoing legal mail and verbally and physically abuse him whenever he files pleadings with the court.  (*Id*.).

### b.     The Plaintiff's Post-Hearing Allegations

After the evidentiary hearing, but before the court issued its order denying the plaintiff's motion for a preliminary injunction, the plaintiff filed a pleading in the interim labeled "Factual Allegations."  (Doc. 78).  In this document, the plaintiff claims that on October 15, 2006, Officers Freeman and Groce, officers who were not mentioned by the plaintiff previously, verbally and physically abused him with pepper spray.  (*Id*. at ¶ 4).  The plaintiff claims that each of the officers sprayed him six times at about five minute intervals.  (*Id*. at ¶ 5).  He states that Officer Witherspoon, another previously unmentioned officer, knew of the intentions of Officers

Freeman and Groce and did nothing to stop it.  (*Id*. at ¶ 10).  Also, the plaintiff contends that R. Felton, also not previously mentioned, did not allow him to "decontaminate" himself after being sprayed with pepper spray.  (*Id*. at ¶¶ 11-13).  The document states that Officers Freeman and Groce also participated in destroying the plaintiff's property.  (*Id*. at ¶ 14).  The plaintiff also filed an affidavit supporting these factual allegations.  (Doc. 79).

The plaintiff next alleges that unnamed officers destroyed and damaged his legal papers relating to his case.  (Doc. 96).  He states that when he left for a court appearance he was forced to leave his property behind, but when they were returned to him, the papers "smelled vile and . . . was [sic] soaking wet with mold and [mildew]."  (*Id*.).

Finally, the plaintiff alleges that he was beaten by six officers on December 23, 2007, and that he was beaten and "choked unconscious" by an officer on January 6, 2008.  (Doc. 114). He claims that at least two individuals saw this January 6 assault take place.  (*Id*.).  The plaintiff claims that one of those individuals had been instructed by officers not to come forward.  (*Id*.). In addition, he claims that the witness heard the officers say that they were going kill the plaintiff and cover it up.  (*Id*.).

### E.     Summary Judgment Standard

Because the special reports of the defendants are being considered as motions for summary judgment, the court must determine whether the moving party, the defendants, are entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving

18

party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The

burden of proof is upon the moving party to establish his prima facie entitlement to summary

judgment by showing the absence of genuine issues and that he is due to prevail as a matter of

law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  Once that initial burden

has been carried, however, the non-moving party may not merely rest upon his pleading, but must

come forward with evidence supporting each essential element of his claim.  *See Celotex Corp.*,

477 U.S. 317; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the plaintiff, who carries the

ultimate burden of proving his action, is able to show some evidence with respect to each

element of his claim, all other issues of fact become immaterial, and the moving party is entitled

to judgment as a matter of law.  *See Celotex Corp.*, 477 U.S. 317; *Bennett v. Parker*, 898 F.2d

1530 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when plaintiff fails to establish a
> prima facie case.  "In such a situation, there can be 'no genuine issue as to any
> material fact,' since a complete failure of proof concerning an essential element of
> the non-moving party's case necessarily renders all other facts immaterial."
> [citations omitted].  Thus, under such circumstances, the public official is entitled
> to judgment as a matter of law, because plaintiff has failed to carry the burden of
> proof.  This rule facilitates the dismissal of factually unsupported claims prior to
> trial.

*Bennett*, 898 F.2d at 1532.

Therefore, this court must determine not only whether or not there are issues of fact, but

must also determine whether the plaintiff has established a *prima facie* case, establishing some

evidence for each and every element of his claim.  *See Id*.

**II.     DISCUSSION**

**A.     The Plaintiff's Claims of Inadequate Medical Treatment**

In order to establish liability under § 1983 for inadequate medical treatment, a prisoner must show that a failure to provide medical treatment amounted to cruel and unusual treatment in violation of the Eighth Amendment.  The United States Supreme Court has held that it is only "deliberate indifference to serious medical needs of prisoners which will give rise to a claim of cruel and unusual punishment in violation of the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  "Medical treatment violates the Eighth Amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'"  *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986)).  The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983.  *Bass v. Sullivan*, 550 F.2d 229 (5th Cir. 1977), *cert. denied*, 434 U.S. 864 (1977).

Mere negligence is insufficient to support a constitutional claim.  *Fielder v. Bosshard*, 590 F.2d 105, 107 (5th Cir. 1979).  As stated by the *Estelle* Court, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  429 U.S. at 106.  Therefore, an accidental or inadvertent failure to provide medical care or negligent diagnosis or treatment of a medical condition does not constitute a wrong under the Eighth Amendment.  *See Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981).

Two components must be evaluated to determine whether the plaintiff has been subjected to cruel and unusual punishment.  "First, [the court] must evaluate whether there was evidence of

20

a serious medical need; if so, [it] must consider whether [the defendants'] response to that need amounted to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989). Clearly, "not every injury or illness invokes the constitutional protection only those that are 'serious' have that effect." *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1081 (3rd Cir. 1976). Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). In *Estelle,* the Court recognized that medical needs constitutionally requiring medical attention ranged from "the worst cases," producing "physical 'torture or a lingering death,'" to "less serious cases," resulting from the "denial of medical care," which could cause "pain and suffering." *Estelle*, 429 U.S. at 103. A "serious" medical need has been defined as "one that has either been diagnosed by a physician as mandating medical treatment or one that is so obvious that even a lay person would recognize the need for a doctor's attention." *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977). *See also Page v. Sharpe*, 487 F.2d 567, 569 (1st Cir. 1973).

If it is established that the plaintiff had a serious medical need, he must then produce evidence of deliberate indifference. *See Mandel*, 888 F.2d at 788. It is not enough that the prisoner show inadequate treatment of a serious medical need; in order to maintain an action grounded in the Eighth Amendment, the prisoner must demonstrate that the defendant or defendants possessed the requisite state of mind. *See Wilson v. Seiter*, 501 U.S. 294, 297, 111 S. Ct. 2321, 2323, 115 L. Ed. 271 (1991). The requisite state of mind, deliberate indifference, has been compared to the mental state of criminal recklessness. *See Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). In ruling that the test for deliberate indifference

21

is subjective based on the individual's state of mind, rather than objective, based on a reasonable

outside observer, the United States Supreme Court has stated that "it is enough that the official

act[] or fail[] to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842. But

the Court also noted that "a fact-finder may conclude that a prison official knew of a substantial

risk from the very fact that the risk was obvious." *Id*.

"Ultimately," the Eleventh Circuit has stated that "there are thus four requirements: an

objectively serious need, an objectively insufficient response to that need, subjective awareness

of facts signaling the need, and an actual inference of required action from those facts." *Taylor v.

Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). Thus, this court shall examine the record with all

four of these elements in mind.

### 1.     Claims Against Dr. Breitling

Dr. Melissa Breitling was a doctor at WEDCF at the time the plaintiff filed this lawsuit

and  the medical doctor about whom he complains most vehemently. The plaintiff alleges that

Dr. Breitling failed to properly treat him for seizures, failed to properly treat him for asthma,

missed appointments with the plaintiff on more than one occasion despite his serious medical

needs, and intentionally inflicted pain on the plaintiff. In response to the court's order to file a

special report, Dr. Breitling submitted four affidavits which have been filed over the course of

this case (Exhibits attached to doc. 88) and references the medical records filed on December 12,

2005 (doc. 41). Upon review of the entire record, it is clear that the plaintiff's allegations against

Dr. Breitling fail to rise to the level of an Eighth Amendment violation. Accordingly, summary

judgment regarding all claims against Dr. Breitling is due to be granted.

a.        **Inadequate Treatment of Seizures**

Dr. Breitling reports that the plaintiff was being treated for a seizure disorder at the time he arrived at WEDCF on May 18, 2005. (Doc. 88-2, Ex.1 at p. 3).  The plaintiff had been prescribed Trileptal, Keppra, Phenobarbital and Dilantin.  (*Id*.).  He arrived with a baseball helmet which he claimed was necessary to prevent head injuries during seizures.  (*Id*.).  The day after he arrived at Donaldson, the plaintiff presented to the infirmary with seizure-like activity. (*Id*. at pp. 3-4).

Multiple doctors have stated their opinion that the plaintiff's seizure-like activity was not actually a true seizure.  His seizure activity was evaluated at the University of South Alabama's Knollwood Hospital just two weeks prior to his transfer.  (*Id*. at p. 4).  Dr. Daphne Bilbrew, the treating physician at Knollwood, determined that Riggins was not suffering from true seizures and diagnosed him as having a "pseudo seizure"[10] condition, which is an attack resembling an epileptic seizure but having purely psychological causes, not physical.  (*Id*.).  Dr. Bilbrew discharged the plaintiff from Knollwood with the following instructions, "He is not having true seizures.  He is malingering.  He can have pseudo seizures in his cell."  (*Id*.).

Dr. Breitling concurred with Dr. Bilbrew's diagnosis, but transferred the plaintiff to Baptist Princeton Hospital on May 19, 2005, for another evaluation.  (*Id*.).  The plaintiff was evaluated at Baptist Princeton by Dr. Karan Vahalla and discharged with the diagnosis of "faking seizures."  (*Id*.).

After his discharge and return from the hospital, the plaintiff was kept in the infirmary for

---

[10]"Pseudoseizures are seizure-like behavior that is not true seizures.  They are common, and even occur in patients who have true seizure disorders.  They are frequently misdiagnosed for true seizures, which means that some patients with 'seizure disorders' have never had a true seizure."  Dan J. Tennenhouse, M.D, J.D., FCLM, Attorneys Medical Deskbook, 4th ed., 25:59 (updated 2008).

several days and returned to administrative segregation after refusing medication.  (*Id*. at p. 5).

Pursuant to the recommendations of the treating physicians when the plaintiff was in the

hospitals, Dr. Breitling weaned the plaintiff from the seizure medications and the helmet was

taken because she did not deem it medically indicated.  (*Id.*).  On July 7,2005, the plaintiff

presented to the infirmary with a head laceration which he claimed occurred when he had a

seizure.  On examination, Dr. Breitling was of the opinion that the wound was self inflicted, but

referred the plaintiff to Carraway Methodist Medical Center for an evaluation.  (*Id*. at p.  6).

An examination was done at Carraway Methodist Medical Center, including a CT scan

which was negative for a head injury.  The plaintiff was evaluated further for seizure activity and

"again diagnosed by multiple Carraway physicians as having pseudo seizures."  (*Id*.).  Dr.

Marshall Boone was one of the doctors who examined the plaintiff at Carraway Methodist

Medical Center.  Dr. Boone diagnosed the plaintiff as having psychogenic seizures and, on

24

discharge, recommended a psychiatric evaluation.[11]  However, the plaintiff repeatedly refused

psychological treatment.  A similar incident occurred on August 10, 2005.  The plaintiff's

"superficial laceration was evaluated by two physicians and appeared to be self-inflicted."  (*Id*.).

The plaintiff denies that the wounds were self-inflicted and denies that any medical

records show that his seizure-like activity was not a true seizure.  (Doc. 32).  However, even if

we are to assume that the plaintiff is truly suffering from seizures and that his wounds were not

self-inflicted, that does not change the court's analysis.  This court may not ask whether the

doctors were correct in their diagnosis, were negligent in their treatment, or even whether they

were guilty of medical malpractice.  This court is only presented with the question of whether Dr.

Breitling was *deliberately indifferent* to the *serious medical needs* of the plaintiff.  *See Estelle v.

Gamble*, 429 U.S. at 106.  For the sake of argument, the court accepts the plaintiff's contention

---

[11]    Nonepileptic seizures are episodes that briefly change a person's behavior and often look like epileptic seizures. The person having nonepileptic seizures may have internal sensations that resemble those felt during an epileptic seizure. The difference in these two kinds of episodes is often hard to recognize by just watching the event, even by trained medical personnel. But there is an important difference. Epileptic seizures are caused by abnormal electrical changes in the brain and, in particular, in its outer layer, called the cortex. Nonepileptic seizures are not caused by electrical disruptions in the brain. . . .
Psychogenic nonepileptic seizures seem to be caused by stressful psychological experiences or emotional trauma. . . .

If the episodes are caused by a physical condition, the underlying cause, such as a heart problem, needs to be identified and treated. . . .

If they are caused by emotional trauma or other types of stress and they look like epileptic seizures, people may be diagnosed with epilepsy and started on antiepileptic drugs (AEDs), which is not the appropriate treatment for nonepileptic seizures. Adjustments in lifestyle are likely to be different for a person with nonepileptic seizures than for a person with epilepsy. . . .
If nonepileptic seizures are diagnosed, an evaluation by a psychologist or psychiatrist is usually the next step to help sort through any stress or trauma that may be the underlying cause of nonepileptic seizures. . . .

Nonepileptic Seizures, <http://www.epilepsyfoundation.org/about/types/types/nonepileptic/index.cfm>.

that his seizure-like activity was a true seizure that constituted a serious medical need; but even if that contention is true, there is no evidence that Dr. Breitling was *aware* of this need and *deliberately* disregarded it.  To the contrary, the evidence shows that Dr. Breitling treated the plaintiff using her professional medical judgment.  And in Dr. Breitling's professional medical judgment, which was wholly consistent with the medical judgment of several other physicians, the plaintiff was not suffering from true seizures.  (*See* Doc. 88-2, Ex. 1 at pp. 4-5).  Dr. Breitling altered the plaintiff's medical treatment in accordance with her professional training, which the plaintiff disputes.  (*Id*.).  These facts are not sufficient to overcome Breitling's motion for summary judgment.

Moreover, the record reflects that Dr. Breitling's medical opinion is well-supported by the evidence for several reasons.  First, she was told that an officer observing the plaintiff's cell witnessed him fake a seizure.  (Doc. 88-3, Ex. 2 at p. 5).  According to Breitling's affidavit, the plaintiff "slowly lowered himself to the floor, began shaking his arms and legs, urinated on himself and then sat upright." (*Id*.).  The plaintiff has offered nothing to retort this evidence. Second, the plaintiff has responded to ammonia sticks during a seizure in a way that is inconsistent with having a true seizure.  Dr. Breitling reports that "on October 20, 2005, Plaintiff again began to jerk his arms and legs while lying on the floor.  When ammonia sticks were placed in his nostrils, he opened his eyes and forcibly pushed the hand holding the ammonia sticks away which indicated he was not having a true seizure." (*Id*.).  Third, on several occasions, the plaintiff had no postictal period immediately following his alleged seizure which is a period that always immediately follows a true seizure which is characterized by extreme tiredness and listlessness.  (*Id*. at p. 3).  For example, on October 14, 2005, Dr. Breitling reports

that after the plaintiff "writh[ed] around on the floor for ten minutes . . . he was fully alert and oriented, and was able to respond to questions appropriately." (*Id*.).  The report of an officer who observed the plaintiff feign a seizure, the plaintiff's response to ammonia sticks, and the absence of a postictal period following any of the plaintiff's alleged seizures make Dr. Breitling's medical opinion that the plaintiff was not having true seizures—at the bare minimum—reasonable and a far short of the subjectively reckless mental state required to establish an Eighth Amendment violation.

**b.      Inadequate Treatment of Asthma**

Dr. Breitling also responded to the plaintiff's claims that she discontinued his medically necessary asthma treatment.  Dr. Breitling reports that the plaintiff was being treated for asthma at the time he arrived at WEDCF on May 18, 2005. (Doc. 88-2, Ex.1 at p. 3).  The plaintiff had been prescribed Albuterol, Q-Var steroid inhaler, and Combivent and/or Atrovent.  (*Id*.). However, in Dr. Breitling's opinion, the plaintiff does not suffer from asthma.  (*Id*. at p. 7).

Just as there is no evidence that Dr. Breitling was deliberately indifferent to his alleged seizure condition, there is no evidence that Dr. Breitling was deliberately indifferent to his asthma condition.  It is true that other doctors have diagnosed the plaintiff with asthma (*see id*.), but the fact that doctors disagree over diagnosis or treatment does not rise to the level of deliberate indifference.  *See Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ("[A] simple difference in medical opinion" is not deliberate indifference).  Certainly a doctor can disagree with another doctor over whether a patient is truly suffering from a serious medical condition without an automatic inference of recklessness.

Even if it is assumed for the sake of argument that the plaintiff is suffering from asthma

and Dr. Breitling was incorrect in her opinion, it is clear from the medical records that Dr.

Breitling was not deliberately indifferent.  Dr. Breitling saw the plaintiff repeatedly and was

never able to medically confirm a diagnosis of asthma because his vital signs, specifically his

oxygen saturation, were not consistent with an asthma diagnosis.  (*See* Doc. 88-2, Ex. 1 at p. 7).

Dr. Breitling has explained that the plaintiff

> does not exhibit the symptoms of an asthma sufferer.  Specifically, his peak flows
> consistently register in the 500 range, and his oxygen saturation at room air
> consistently registers in the 98-99% which is totally inconsistent with a diagnosis
> of asthma.
>
>     On September 26, 2005, Mr. Riggins presented to the infirmary
> complaining of an asthma attack.  I personally evaluated Mr. Riggins and
> determined that his lungs were clear without any signs of wheezing, rhonchi, or
> rales, and that his O2 saturation was extremely high.  Thereafter, I discontinued
> his bronchial aerosol inhalation treatment in the infirmary.  I did not discontinue
> any prescription asthma medication due to his complaints regarding anyone. . . .  I
> discontinued his infirmary nebulizer treatment because I examined his lungs,
> which I determined were clear . . . .

(*Id*.).

It is true that doctors such as Dr. Hudson have diagnosed the plaintiff with asthma after

Dr. Breitling ceased practicing at WEDCF.  (*See* Hearing Transcript).  However, at the July 18,

2006 evidentiary hearing, Dr. Hudson testified not only that Dr. Breitling was justified in her

reluctance to prescribe asthma medication, which carried with it various dangers and side-effects,

but also that the plaintiff received excellent medical care while he was at WEDCF.  (*Id*.).  His

statements can hardly be regarded as condemnation of Dr. Breitling's medical judgment, and

even if Dr. Hudson's hearing testimony was construed in such a way, faulty medical judgment

may rise to the level of negligence but does not rise to the level of deliberate indifference.  *See*

*Estelle*, 429 U.S. at 106.

### c.        Infliction of "Wanton and Cruel Pain"

The plaintiff submitted an affidavit on November 21, 2005, stating that he was taken to the infirmary on October 12, 2005, for an asthma attack, but was not treated.  (Doc. 32).  He further claims that he was placed in isolation as punishment and nothing was done for him even when he was having seizures other than

> inflicting wanton and cruel pain on me by misuse of ammonia capsules causing chemical burns to my nose and lips on October 18, 2005 Dr. Breitling discontinued all of my seizure medications and has since sit and allowed me to seize for hours at a time with no medical treatment or help while D.O.C. officials and nurses watch.

(Doc. 32 at p. 6).

As previously discussed, Dr. Breitling was able to use the ammonia to diagnose plaintiff, showing that his seizure was not a true seizure.  (*See* Doc. 88-3, Ex. 2 at p. 5).  There is no evidence that by using this ammonia, Dr. Breitling intended to inflict "wanton and cruel pain" on the plaintiff.  If there is evidence to that effect, the plaintiff fails to provide it beyond the conclusory statement itself.  (*See Id*.).  And such a statement is insufficient to support his cause of action.

Moreover, on December 12, 2005, Dr. Breitling signed a second affidavit in which she reviewed and explained the medical care that was provided the plaintiff at the WEDCF from October 2, 2005, through November 29, 2005, and addressed his claim that he was placed in isolation as punishment.  (Doc. 88-3, Ex. 2).  When the plaintiff presented to the infirmary on October 12, 2005, with a variety of complaints he was placed in an isolation cell in the infirmary for observation and lab work was ordered.  (Doc. 42).  There is no evidence, beyond the plaintiff's conclusory statement, that Dr. Breitling placed him in isolation as punishment or that

Dr. Breitling intentionally inflicted "wanton and cruel" pain on the plaintiff.

### d.     Missed Appointments

The plaintiff also alleges that Dr. Breitling failed to keep appointments with him. Specifically, he alleges that he made appointments to see Dr. Breitling because of his difficulty breathing.  (Doc. 10, 32 & 46).  He said those appointments were scheduled on August 16, 2005, September 13, 2005, and December 13, 2005, but Dr. Breitling "refused" to see him.  (Doc. 10 & 46).  The plaintiff fails to indicate whether this refusal was accompanied by a refusal of other medical personal to provide a necessary physical examination or other treatment.

The failure to keep an appointment is not evidence of deliberate indifference absent some further showing that Dr. Breitling subjectively knew of a risk of serious harm to the plaintiff, but disregarded that risk by conduct that constitutes more than gross negligence.  *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005).  There is no evidence that Dr. Breitling's "refusal"—assuming that she did, in fact, refuse to see the plaintiff—indicated that Dr. Breitling knew and disregarded a risk to the plaintiff that constitutes deliberate indifference.  Dr. Breitling states that she has never denied the plaintiff medical assistance when it was medically necessary, but she goes on to state that "there may have been occasions, unknown to me, when he presented to a nurse, was screened by that nurse, and it was determined that it was not medically necessary for Mr. Riggins to be seen by a doctor."  (Doc. 88, Ex. 1 at 8-9).  She goes on to state:

> Mr. Riggins has on occasion been brought to the infirmary two to three times within a 24-hour period with some complaint.  He has complained of seizures, chest pains, breathing problems, back pains, stomach pains, blurred vision, in addition to other complaints.  I have never confirmed medically any condition which is related to his complaints.

*Id*.

Dr. Breitling's cancellation of appointments may have been due, not to negligence, but to her professional judgment or simply not being aware of a need of the plaintiff.  Dr. Breitling describes plaintiff as a "malingerer" who "constantly invents and/or exaggerates medical conditions in an effort to seek attention or, in the alternative, to obtain medication which is not indicated for him."  (*Id*. at p. 3).  She adds that, "he has a history of repeatedly masturbating in the presence of female nurses and has been removed forcibly from the infirmary on multiple occasions due to this conduct."  (*Id*.).

After considering the detailed account of the plaintiff's treatment given by Dr. Breitling and the multitude of medical records concerning the plaintiff, the court is satisfied that no reasonable fact finder could conclude from the record that Dr. Breitling was deliberately indifferent to any of the plaintiff's serious medical needs by failing to keep three of his many appointments.  Even accepting the plaintiff's allegation that Dr. Breitling did not grant each and every one of the plaintiff's numerous requests for appointments, this does not rise to the level of deliberate indifference after considering the fact that Dr. Breitling has never been able to medically confirm *any* medical condition related to the plaintiff's complaints.  (*Id*.).  In short, there is no evidence that Dr. Breitling was ever aware that the plaintiff actually *had* serious medical needs, much less that she was indifferent to them.

### 2.     Claims against the Medical Defendants

The plaintiff also alleges that both Betty Rogers, L.P.N., and Dr. Hudson denied him treatment for asthma.  (Doc. 27, 52, 53 & 57).  Both Dr. Hudson and Ms. Rogers have responded to the plaintiff's accusations.  On October 5, 2007, Dr. Charles Hudson, Medical Director for the WEDCF from December 19, 2005 through March 2, 2007, submitted an affidavit in which he

addressed the allegations made against him in the plaintiff's amended complaint. (Doc. 100).  Dr.

Hudson states as follows:

> I first evaluated Mr. Riggins as a patient on January 15, 2006.  At that
> time, I placed him on a Combivent aerosol inhaler, a bronchodilator, for
> complaints of shortness of breath secondary to asthma.  On January 31, 2006, this
> particular treatment was discontinued.  February 7, 2006 Mr. Riggins presented
> with complaints for left sided headache.  I evaluated Mr. Riggins and determined
> that he had a pressure based headache with no aura, nausea or sensitivity to light.
> Mr. Riggins was neurologically intact with no sinus tenderness or chest sounds.
> he was given Percogesic for pain.  Mr. Riggins again presented on February 21,
> 2006 with similar complaints of left-sided headache with questionable double
> vision and no complaints of nausea.  He also complained of "wheezing."  I
> subsequently prescribed Mr. Riggins inhaled Albuterol and QVAR.  Mr. Riggins
> continued to have complaints for shortness of breath which prompted me to treat
> with Theophylline.
>
> I continued to treat Mr. Riggins' complaints for shortness of breath with
> Theophylline, QVAR and Proventil until March, 2007 when I ceased practicing as
> Donaldson's Medical Director.

(*Id.*, Ex. A at p. 2).

> Betty Rogers, L.P.N., also submitted an affidavit wherein she states,

> On August 23, 2005, Mr. Riggins presented to the healthcare unit with
> complaints of shortness of breath secondary to asthma.  I checked Mr. Riggins'
> oxygen saturation and found it to be 95% via pulse oximeter.[12]  I noted Mr.
> Riggins had minor wheezing in the lungs and asked him to vigorously cough to
> clear his lungs for examination.  He refused.  I subsequently placed Albuterol in a
> nebulizer and handed it to him with instructions to place the device in his mouth.
> Mr. Riggins refused to place the nebulizer in his mouth and, instead began to
> argue with an ADOC official about an unrelated issue.  I again asked Mr. Riggins
> to place the nebulizer in his mouth and inhale but he refused stating "you can't tell
> me what to do."  He subsequently refused to allow me to listen to his lungs and
> told me that he would "have my [your] nursing license."  I re-checked his oxygen
> saturation, found it to be at 95%, and discharged him from the infirmary.
>
> Mr. Riggins again presented to the infirmary on August 31, 2005 with
> complaints of shortness of breath.  His oxygen saturation fluctuated between 95%

[12]Oxygen readings between 95% and 100% are considered normal.

and 96% and his lungs were clear.  I subsequently discharged Mr. Riggins from
the infirmary without Albuterol treatment which was contraindicated for his
treatment.  He became irate stating that I failed to treat him appropriately.

(Doc. 100, Ex. B at p. 2).

Clearly, the medical defendants have provided the plaintiff with treatment with extensive

medical treatment.  The plaintiff has interjected statements of other medical professionals who

state that his treatment should be different than what it is now (doc.  83 & 51), but, as previously

discussed, this too is insufficient to state a claim based on the Eighth Amendment.  Nor is the

fact that the plaintiff is dissatisfied with his treatment regiment for asthma sufficient to sustain

his claims in view of the defendants' motion for summary judgment.  *See Hamm v. DeKalb

County*, 774 F.2d 1567, 1574 (11th Cir. 1985),  *cert. denied*, 475 U.S. 1096 (1986).

Again, assuming that Dr. Hudson and Ms. Rogers incorrectly withheld treatment, this is

evidence of malpractice, not deliberate indifference.  Both Dr. Husdon and Ms. Rogers have

treated the plaintiff on numerous occasions, and nothing in the record indicates that the treatment

administered by them was ever lacking to such a degree that it raises a constitutional question.

In addition, the plaintiff's complaints that defendants Price and Hynes have failed to

respond to his inquiries are not sufficient to state a cause of action for inadequate medical

treatment of a constitutional proportion under the peculiar circumstances presented herein.  The

failures to respond to the plaintiff, assuming his allegations that he received no response are true,

do not raise a constitutional issue under these circumstances.

Since the plaintiff has not established the element of a subjectively reckless mental state

on the part of any medical defendant, he has failed to meet his burden of raising genuine issues of

material fact and summary judgment for the medical defendants is due to be granted.

### 3.      Medical Claims against the Corrections Defendants

In addition to claiming that the medical personnel at WEDCF failed to provide him with

adequate treatment, the plaintiff has asserted that some of the corrections defendants have failed

to provide him with adequate and prompt medical attention when it was needed.  Many of the

plaintiff's allegations are based on the corrections defendants' delay in calling for medical help

during his alleged seizure episodes (doc. 1, 27, 35, 46, 50, 51 & 112), the corrections defendants

failure to routinely check his prison cell (doc. 1), and certain officers alleged interference with

"certain medical needs profiles" (doc. 27).  The court finds that there is nothing on the record that

would sustain the plaintiff's cause of action for inadequate medical care against the corrections

defendants.

### a.      Delayed Medical Care

The plaintiff claims that, on numerous occasions, corrections officers failed to timely call

for the help of medical staff.  In support of this, the plaintiff offers personal affidavits which state

that the corrections defendants let him seize in his cell for up to an hour.  (Doc. 64).  However,

vague accusatory statements do not sufficiently state a cause of relief.  *Bell Atlantic Corp. v.

Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007).  This court cannot

entertain allegations by the plaintiff that are not supported by specific facts presented on the

record.  It is the plaintiff's burden to respond to the defendant's properly supported motion for

summary judgment with evidence showing that there are genuine issues of material fact.  *See

Celotex Corp.*, 477 U.S. 317; *Anderson*, 477 U.S. 242; *Barfield v. Brierton*, 883 F.2d 923 (11th

Cir. 1989).  The plaintiff in large part has failed to offer a proper response to the defendants'

motion.  Instead, he has relied on vague accusatory statements against which the defendants may

34

not possibly be expected to defend.  Therefore, the court will only address specific incidents

mentioned in the plaintiff's affidavits and other material.  Insofar as the plaintiff has failed to

give details of his claims in personal affidavits or otherwise, summary judgment as to those

claims is due to be granted.

First, the plaintiff states that on July 9, 2005, Officer Hawkins "deliberately and

intentionally watched me seize for over 30 minutes while banging head on the hard floor and

refused to call for medical officials."  (Doc. 32).  The plaintiff's wording—that Officer Hawkins

"refused to call"—suggests that someone requested he call for medical help, and yet Hawkins did

not.  The plaintiff does not indicate who asked Hawkins to call for medical help nor does he say

how Hawkins was aware these events were occurring.

The plaintiff did submit the affidavit of Abd-Salaam Nuba Amun, a fellow inmate, who

states that he witnessed the plaintiff suffer "seizure attack(s) while being housed in a[n]

unpadded and unsupervised prison cell."  (Doc. 35).  The affidavit states that the plaintiff

sustained "injuries of a busted lip and head" and that Amun had to "holler and scream for 'help'

when Correctional Officers were unaware that Mr. Riggins was having a seizure attack."  (*Id.*).

This affidavit fails to provide any evidence that suggests the named officers were indifferent to

the plaintiff's medical needs and fails to give a time frame for the response by the officers.  In

fact, the affidavit is void of any mention of Hawkins's name at all.[13]  In contrast, Hawkins did

submit a detailed affidavit in which he explained this incident:

I, Officer Ronald Hawkins, was conducting a security check in Segregation I at

---

[13]Again, as noted above, Amun's "Administrative Complaint" that was attached to the plaintiff's original complaint (doc. 1) mentions Officer Hawkins and his delay in getting medical treatment. However, Amun fails to add these facts to his signed and sworn affidavit.

approximately 1:30 p.m. on July 9, 2005. I walked into Cell #4 and observed inmate Darryl Riggins, B.M. #184051, lying on the floor shaking as if he was having a seizure. I then advised the cubicle operator, COI Darryl Kemp, to call a supervisor. At approximately 1:35 p.m., Lt. Kenneth Clark entered Segregation I. Lt. Clark informed Officer Kemp to call the infirmary for a stretcher. At approximately 1:38 p.m., Officers Reginald Bolling and Gregory King entered the unit with Nurse Jackie Chandler and the stretcher. Inmate Riggins was placed on the stretcher and taken to the infirmary . . . .

(Doc. 20, Hawkins affidavit). Hawkins submitted a copy of the duty log and the emergency treatment record to support his statement that he responded immediately when he found the plaintiff. (Hearing Transcript, Ex. 1). Because the plaintiff does not offer any properly submitted *facts* to support his claim that Hawkins watched him have a seizure and did not notify medical personnel for thirty minutes, he has failed to meet his burden to respond to the defendants' motion for summary judgment that is properly supported by uncontradicted facts.

Second, the plaintiff alleges that Sgt. Peterson instructed Nurse Smith to leave him in his cell while he was suffering a seizure. (Doc. 27). In support of this allegation, he offers the affidavit of Earnest Arrington. (Doc. 112). Arrington's affidavit states that when Sgt. Peterson and Nurse Smith arrived at the plaintiff's cell at least twenty or thirty minutes after he began to suffer from a seizure, Sgt. Peterson told Nurse Smith to "leave his ass right there, he ain't going nowhere." (*Id.*). However, this allegation, even if true, is also insufficient to survive summary judgment. An officer and a nurse observing the plaintiff, whose actual status as a seizure patient had been in doubt, and deciding to leave him in his cell does not constitute deliberate indifference unless they are actually aware of the plaintiff's serious medical need and deliberately disregard it. *See Estelle*, 429 U.S. at 104-06. Assuming for the moment that the plaintiff was suffering from a true seizure, there is no evidence that Sgt. Peterson was not acting on his belief

36

that the plaintiff was not.  As already discussed, there is substantial evidence that his seizures were not real, and thus, a belief that the plaintiff had no serious medical need is reasonable.  As a result, summary judgment as to this claim is due to be granted.

        **b.**        **Inadequate Supervision of Inmates**

The plaintiff also complains that the defendants have failed to check his cell every thirty minutes as the plaintiff has claimed is their responsibility.  He fails to explain how the failure to frequently patrol the cells amounts to deliberate indifference.  Again, it is not the role of a federal court to hear simple negligence cases, nor may this court assume that plaintiff's vague statements are correct without requiring him to provide the defendants with any notice whatsoever of the specific incidents of which he speaks.

There is no evidence from which a jury could infer deliberate indifference particularly in light of the evidence in the record.  During the evidentiary hearing, Capt. Richburg explained how the officers check inmates and how they keep detailed logs.  And as previously mentioned, he supplied some of those logs to the court during the hearing.  (Hearing Transcript, Ex. 1).  Other than conclusory allegations that the defendants did not properly check his cell and keep him under observation, he fails to meet his burden to provide some evidence that the defendants were deliberately indifferent to his serious medical needs.  Therefore, this claim cannot survive summary judgment.

        **c.**        **Interference and Indifference to Medical Care**

First, the plaintiff claims that "since June 17, 2005, [he] has continue [sic] to write administrative complaints to Head Warden Terrance McDonnell and Kenneth Jones, Deputy Warden Huntley and has gotten no response."  (Doc. 1 at ¶ 9).  He also complains that "since

June 17, 2005[, the] plaintiff has continue [sic] to write and notify Captain Richburg and

Supervisor Lt. Clark and Melvin Wilson." (Doc. 1 at ¶ 10).  However, the mere failure of an

officer to respond to the writings of a prisoner does not rise to the level of a constitutional

violation and is due to be dismissed.

Second, the plaintiff claims that, "defendant[s] Jones, McDonnell, Huntley, Richburg,

Clark, Wilson, Price, Hines['] failure to intervene in the ongoing injuries on plaintiff on July 07,

2005, July 09, 2005, August 09, 2005, amounted to deliberate indifference in violation of

plaintiff's rights under the . . . Eighth Amendment."  (Doc. 1 at ¶ 14).  However, the plaintiff

fails to go beyond vague allegations to establish how such a failure, even if true, constitutes

deliberate indifference.  Again, the standard in a § 1983 case is not mere negligence.  *See*

*Farmer*, 511 U.S. at 835.  The standard involves the necessarily subjectively reckless mental

state.  *Id*. at 836-37.  In this case, the plaintiff has failed to provide any evidence from which a

jury could infer the requisite culpable mental state.  Accordingly, the claim is due to be

dismissed.  The plaintiff vaguely states, without more, that the defendants "fail[ed] to intervene"

without providing any evidence that the they were subjectively aware of the facts that establishes

plaintiff's serious medical need.  (*Id*.).  Such an allegation does not support a constitutional claim

under the Eighth Amendment because the plaintiff has not alleged facts sufficient to infer the

required mental state.

Third, the plaintiff next complains that on August 9, 2005, Warden Jones, Deputy

Warden Huntley, Capt. Richburg, Lt. Clark, and Lt. Melvin Wilson "interfered with my medical

treatment by telling the doctor to discontinue certain special medical need profiles." (Doc. 1 at ¶

13).  In an amended complaint, he clarifies the special needs profile as one that ordered the

plaintiff's hands to be cuffed in front of him because of his seizure condition.  (Doc. 27).  He does not explain how he is privy to conversations between the officers and Dr. Breitling, how such a "medical need profile" is important to his condition, how discontinuing such a doctor's order amounts to deliberate indifference of his constitutional rights, or that he was seriously injured as a result of the change.  Therefore, the plaintiff's accusations that corrections officers interfered with certain "medical needs profiles" are also insufficient to state a constitutional claim and cannot overcome the motion for summary judgment.

Fourth, the plaintiff claims that on September 23, 2005, he had another seizure, and he was picked up by Sgt. Ryans and two other officers who deliberately threw him on the floor, causing the right side of his head to swell.  (Doc. 14).  Sgt. Ryans responded to this allegation by stating that he and two other officers, upon instruction from the nurse, picked the plaintiff up and put him on a stretcher.  (Doc.  86-2 at p.12).  He does not dispute the plaintiff's claim that he deliberately dropped him.  The plaintiff supports his allegations with the affidavit of Earnest Arrington, who said that he heard Officer Ryans give the order to "drop his  ass" after raising the plaintiff onto a stretcher.  (Doc. 112).  While it is true that these allegations may be sufficient to survive summary judgment on solely an Eighth Amendment "unnecessary infliction of pain" claim, they are insufficient to state a medical claim against Sgt. Ryan.  The remaining claim is more fully discussed below.

### 4.    Medical Claims Conclusion

After a careful and thorough review of the hundreds of pages of claims and complaints submitted by the plaintiff in this case, the affidavits of medical personnel, and the voluminous medical records, it is abundantly clear that the plaintiff has been provided adequate medical care

and treatment for all of his medical complaints.  The plaintiff has been examined by numerous

doctors, undergone CT scans, EEG and EKG testing, and various lab tests.  He has been

diagnosed with pseudoseizures for which he refuses the recommended psychological treatment.

Although the plaintiff may be dissatisfied with the treatment he has received, he has failed to

dispute *with specific facts*, the statements in the defendants' affidavits regarding the treatment he

has received.  Accordingly, the defendants are entitled to summary judgment as to the plaintiff's

claims of inadequate medical care.

### B.    Plaintiff's Claims of Wanton and Unnecessary Infliction of Pain

#### 1.    Sgt. Ryans

In the plaintiff's "Motion for [an Imm]ediate Temp[ora]ry Restrain[]ing [O]rder," the

plaintiff alleges that "[o]n September 23, 2005, [the] plaintiff began to seizure[, but] after finding

consciousness[, the] plaintiff was picked up by Sgt. Ryans and two other officers who

intentionally threw plaintiff to the hard cement floor."  (Doc. 14 at ¶ 8).  This account is

supported by the affidavit of inmate Earnest Cunningham (doc. 112) who said that Sgt. Ryans

instructed the other officers to "drop his ass and they slammed Riggins to the hard cement floor."

(Doc. 112 at p. 2).  This court has construed this motion as a motion to amend, as well as a

motion for injunctive relief.  While the court denied the plaintiff's motion for injunctive relief,

the court granted the motion to amend.  Now the court must now decide whether these

allegations rise to a cognizable claim under the Eight Amendment.

After considering both Sgt. Ryans affidavit and the plaintiff's medical records dated

September 23, 2005, that contradict the plaintiff's allegations, the court is of the opinion that the plaintiff has established a genuine issue of material fact as to whether Sgt. Ryans inflicted cruel and unusual punishment on the plaintiff.  Accepting the plaintiff's version of the event, as this court must do at this juncture, it is sufficient to state an Eighth Amendment claim.

The United States Supreme Court has stated that "'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eight Amendment.'" *Hope v. Pelzer*, 536 U.S. 730, 737, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (quoting *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)).  The plaintiff's allegations in this case, supported by a Cunningham's affidavit, are that Sgt. Ryans ordered the plaintiff dropped to the cement floor, causing him unnecessary pain and injury for no apparent reason.  (Docs. 14 & 112).  The fact that the pain inflicted on the plaintiff is without a discernable justification causes Sgt. Ryans's actions to run counter of the Eighth Amendment. The United States Supreme Court has stated that "[a]mong 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.'" *Hope*, 536 U.S. at 737 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S. Ct. 2392, 69 L. Ed. 59 (1981)).  Because the record, taken in the light most favorable to the plaintiff, reveals that Sgt. Ryans's actions caused  "'unnecessary and wanton' infliction of pain . . . without penological justification" on the plaintiff, the motion for summary judgment as it relates to Sgt. Ryans's alleged actions on September 23, 2005, is due to be denied.

### 2.      Sgt. Carter

The plaintiff's alleges that Sgt. Carter "keeps physically assaulting me and threatens to kill me *if I buck* while they shake my cell down."  (Doc. 50) (emphasis added).  The plaintiff

does not say that Sgt. Carter used physical force without reason.  In fact, the very sentence in which the plaintiff accuses Carter of using physical force may be read in two different ways. First, the sentence can be read to mean that the plaintiff was assaulted and threatened not to "buck."  The sentence can also be read to mean that the plaintiff was assaulted and threatened *when* he "bucked."  This claim is too vague to survive summary judgment.  Additionally, and most importantly, mere words are insufficient to state an Eighth Amendment claim in this instance.

The plaintiff submitted the affidavit of Carl Hupp, another fellow inmate, in order to support this allegation.  (Doc. 54).  The affidavit claims that "on two occasion[s,] I saw COII Ronald Carter physically push[,] punch[,] and shove Darryl Riggins around stating [']I want you to buck so we will have a reason to kill you[.']"  (*Id.*).  However, this affidavit does not provide the necessary specificity to allow the plaintiff's claim to survive summary judgment.  Not only does it fail to give specific dates, but it fails to provide any context.  As a result, summary judgment as to the plaintiff's claims against Sgt. Carter is due to be granted.

B.      **The Plaintiff's First Amendment Claims**

The court will now separately discuss the claims by the plaintiff that several corrections defendants *deprived him of* access to the courts.  Then the court will address the separate issue of the plaintiff's claims of *retaliation for* his actions in accessing the courts.

1.      **Deprivation of The Plaintiff's Right to Access the Courts**

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment assures inmates a right of meaningful access to the courts.  However, the right of access to the courts, as defined in *Johnson v. Avery*, 393 U.S. 483, 89 S. Ct. 747, 21 L. Ed. 2d 718 (1969), and

*Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), requires only that inmates and detainees be provided reasonable means by which they may bring their legal claims before the court. The *Bounds* Court held that this right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or assistance from persons trained in the law. *Bounds*, 430 U.S. at 829.

The plaintiff complains that on September 26, 2005, Lt. Clark, Capt. Richburg, and Sgt. Carter took his legal books and other personal property. (Doc. 14 at p. 2). By affidavit, Capt. Richburg states that the plaintiff was in the infirmary under a twenty-four observation order on September 26, 2005, and asked that his personal property be brought from his temporary cell to the infirmary. (Doc. 86-2, Affidavit of Jimmie Richburg). Sgt. Carter personally supervised the gathering of the plaintiff's personal property and the taking of the items to the infirmary. (Doc. 86-2 at p. 10).

Assuming the incident occurred as alleged by Riggins, that is, that the officers took his legal work and personal property, he fails to state a cause of action because he does not allege that he suffered any specific prejudice in any legal proceeding because of the officers' actions. Without a showing of prejudice, the plaintiff cannot establish a violation of his right of access to the courts. *See Chandler v. Baird*, 926 F.2d 1057, 1061-63 (11th Cir. 1991). The plaintiff does not claim that he was denied access to the courts or adequate legal assistance, only that the officers took his legal materials. As a result, summary judgment is due to be granted as to this claim.

> **2.     Retaliation for The Plaintiff's Exercise of his Right to Access the**

**Courts**

The Eleventh Circuit has recently reiterated the elements for establishing a cause of

action for retaliation:

> To state a retaliation claim, the commonly accepted formulation requires that a
> plaintiff must establish first, that his speech or act was constitutionally protected;
> second, that the defendant's retaliatory conduct adversely affected the protected
> speech and third that there is a causal connection between the retaliatory actions
> and the adverse effect on speech; and third, that there is a causal connection
> between the retaliatory actions and the adverse effect on speech.

*Douglas v. Yates*, No. 07-10518, 2008 WL 2875804, at *4 (11 th Cir. 2008) (unpublished)

(quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)).

The plaintiff was engaged in protected conduct in filing this suit.  The Supreme Court has

stated that "[i]t is now well established beyond doubt that prisoners have a constitutional right of

access to the courts."  *Bounds*, 430 U.S. at 821.  The plaintiff claims that officers have retaliated

against him for exercising this right.  (Doc. 14).  He makes both vague and specific accusations

to support this claim.

### a.      Threats

The plaintiff complains that various officers have threatened him with bodily harm.  In a

motion that the court necessarily must construe as a motion to amend, the plaintiff claims that on

September 23, 2005, Capt. Richburg, Sgt. Ryans, Sgt. Carter, Officer Hawkins, Lt. Clark, and Lt.

Wilson threatened to physically harm him for filing lawsuits against them, and a few days later

Officer Hawkins twice threatened to kill him if he continued this lawsuit.  (Doc. 14 at p.2).  On

September 26, 2005, Capt. Richburg and Sgt. Carter purportedly threatened to beat the plaintiff

and make him seize to death.[14]   (*Id.*).   The plaintiff alleges that he has been told by head warden

Kenneth Jones, Capt. Richburg, Lt. Clark and others "they don't care or have to give me medical

treatment." (Doc. 1 at ¶ 16).   These allegations are contained mostly in the motions and not

evidence on the record.   With the exception of certain allegations against Sgt. Ryans (*see* doc.

46), the plaintiff has failed to support such allegations with specific facts through records,

affidavits, or other testimony.   Accordingly, the plaintiff's allegations of threats—with the

exception of those allegations relating to Sgt. Ryans which the court will next address—are

vague, unsupported, and cannot survive the motion for summary judgment.


### b.      Assault

The plaintiff asserts several allegations that certain defendants assaulted him in retaliation

for this suit.   First, he states that on November 23, 2005, Officer Ryans "twisted" his arms "in a[]

malicious[] and sadistic[] way to cause harm." (Doc. 46).   He states that Sgt. Ryans

"threaten[ed] to do bodily harm to [him] about [the] lawsuit [he] filed against [Sgt. Ryans.]"

(*Id.*).   This allegation is supported by the affidavit of Earnest Arrington who reports essentially

the same thing.   (Doc. 112).   These allegations are sufficient to overcome the defendants' motion

for summary judgment as it relates to the retaliation claim.   The plaintiff's claims of threats of

bodily harm in addition to the actual injuries to the plaintiff are enough for a reasonable trier of

fact to find that a person of ordinary firmness would be deterred from his right to access the

courts.   *See Bennett*, 423 F.3d at 1250.   It is true that there is a dispute as to what occurred

---

[14]As to Carter, the plaintiff alleges that he "repeatedly [is] running in my cell ramshaking it and threatening me with physical violence." (Doc. 46).   In another affidavit, as will be discussed below, the plaintiff has alleged that "Carter keeps physically assaulting me and threaten[ed] to kill me if I buck while they shake my cell down every other day. . . ."  (Doc. 50 at p. 1).

regarding this matter, however, the court may not weigh the evidence.  This court can only determine if there is a genuine issue of material fact at this juncture.  The plaintiff's allegations and the supporting evidence along with Ryans's denial creates a genuine issue of material fact.  Therefore, summary judgment on the retaliation claim concerning Ryans is due to be denied.

Second, the plaintiff claims that on December 10, 2005, he experienced a seizure, and when he was "found consciousness . . . at the health care unit . . . [he] was being physically and verbally assaulted by both D.O.C. officials and P.H.S. nurses [who were] intentionally pulling and snatching on it [sic] causing [plaintiff] severe pain in a malicious[] and sadistic[] way." (Doc. 46).  The plaintiff claims that he was subsequently "handcuffed and six D.O.C. officials drag[g]ed [him] out of the health care unit and kicked and beat [him] with sticks [and] intentionally opened [his] mouth and sprayed [him] with pepper spray in [his] mouth and face". (*Id*.).  However, the plaintiff has not named the Alabama Department of Corrections or Prison Health Services as defendants.  Even if he did so, *respondeat superior* would not apply.  *See Marsh v. Butler County*, 268 F.3d 1014, 1035 (11th Cir. 2001).  This leaves only possible claims against individual defendants who were not named in this affidavit.  Since unnamed individuals cannot be expected to respond to the plaintiff's accusations, he has failed to state a claim for relief.  Additionally, it is now to late to amend the same under the circumstances.  Accordingly, this claim must fail in view of the present motion for summary judgment.

Third, the plaintiff alleges that Carter has taken personal items from his cell, including law books, and also assaulted him.  (Doc. 50).  He supports his claim with the affidavit of Carl Hupp.  (Doc. 54).  As previously discussed, Hupp's affidavit states that "on two occassion[s, he] saw COII Ronald Carter physically push[,] punch[,] and shove Darryl Riggins around stating I

46

want you to buck so we will have a reason to kill you." (*Id.*).  The court does not find these allegations and supporting affidavits sufficient to survive summary judgment because there is no evidence of a causal link between the plaintiff's protected conduct, the filing of this lawsuit, and Carter's actions.  The plaintiff has not supported, with specific evidence, the allegation that Carter assaulted him because of his filing of this suit.  Additionally, there is no evidence that his ability to access the courts has been hindered.  In fact, the plaintiff has been able to submit two briefs to this court including legal research.  (Doc. 36 & 105).  It is clear that his ability to research the law and communicate with the court has not been disrupted in any meaningful way by the temporary absence of law books.  Additionally, the plaintiff does not dispute the contention that officers later brought to him various legal books while he was in twenty-four hour observation.  While these allegations are serious, they do not amount to a constitutional violation because there is no causal connection between the adverse action, Carter's assaultive behavior, and the protected conduct, access to the courts.  *See Bennett*, 423 F.3d at 1250.

Fourth, the plaintiff claims that staff at WEDCF read his outgoing legal mail and verbally and physically abuse him whenever he files pleadings with the court.  (Doc. 46).  However, the plaintiff again fails to mention any specific defendant who is responsible for the purported violation.  His accusations of physical and verbal abuse also stand alone, without supporting affidavits or other evidence.  As such, summary judgment on this claim is due to be granted the defendants.

### c.    Inadequate Medical Care and Conditions of Confinement

The plaintiff makes general allegations of inadequate medical care and worsening conditions of confinement as a result of his filing of this suit.  First, he complains that he was

moved into an isolation cell "as punishment . . . without . . . heat[,] no window[,] and nothing to keep warm but a blanket and two thin sheets." (Doc. 46). Again, the plaintiff fails to name an individual responsible for this transfer and fails to produce any evidence that there was a causal connection between his action in filing this suit and the unnamed official's action in transferring him to isolation. As a result, this claim is due to be dismissed.

Second, the plaintiff alleges (doc. 50) that Capt. Richburg, Warden Jones and Officer Carter have taken personal items from his cell including law books. (*Id*). But the fact that the officers took personal items, including law books, does not by itself, state a causal connection between these takings and any adverse effect on the plaintiff's speech. To the contrary, as the court has just pointed out, the plaintiff's speech seems to be uninhibited. If his speech has been inhibited, the plaintiff fails to point out in his subsequent pleadings specifically *how* the officers' actions have had an adverse affect on his access the court. As a result of this failure, this claim is also due to be dismissed.

Third, the plaintiff states that unnamed medical staff members have retaliated against him by failing to provide him proper medical care. He alleges that Nurse T. Love, an individual unnamed in this lawsuit, stated that the plaintiff was "to be taking the [nebulizer] treatments twice a day or as need[ed] but no one wants [the plaintiff] in the infirmary because of [his] filing paperwork on everyone." Despite Love's instructions, the plaintiff claims he was denied access to nebulizer treatments on numerous occasions. Beyond the fact that this allegation is general and does not state how the she knows of the staff motivations for not treating the plaintiff for asthma, it also fails to identify specific the offending defendants. Therefore, this statement by Love is much too vague to state a claim for relief. It does not rebut the defendants' properly

supported motion for summary judgment.

Fourth, the plaintiff claims that Sgt. Peterson and Nurse Smith's actions in standing by and doing nothing as the plaintiff allegedly suffered a seizure was in retaliation for this suit. (Doc. 111). Again, the plaintiff does not offer any evidence to support the assertion that these acts were in retaliation for his filing of this suit. As a result, this claim is due to be dismissed.

Accordingly, summary judgment is due to be granted as to all defendants on the retaliation claims with the exception of Officer Ryans.

### D.     Qualified Immunity

Now that the court has determined that the plaintiff's allegations against Sgt. Ryans are sufficient to survive the motion for summary judgment, the court must consider whether Sgt. Ryans is entitled to any immunity defenses. The plaintiff stated in the evidentiary hearing that all parties were being sued "individually." (*See* Hearing Transcript). The United States Supreme Court has stated:

> Despite . . . participation in . . . unconstitutionally impermissible conduct, [a defendant] may nevertheless be shielded from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 47 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). . . .

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held to be unlawful, *see Mitchell [v. Forsyth*, 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411 [(1985)]; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002).

49

In this case, assuming that the plaintiff's allegations are true, Sgt. Ryans should have known his physical assaults on the plaintiff ran contrary to the plaintiff's constitutional rights.  It is clearly established that "'unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eight Amendment.'" *Hope*, 536 U.S. at 737 (quoting *Whitley*, 475 U.S. at 319 (1986)).  In both of the circumstances at issue in this matter, Sgt. Ryans was purportedly inflicting pain without "'penological justification.'" *Hope*, 536 U.S. at 737 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)).  As a result, Sgt. Ryans is not entitled to qualified immunity under the circumstances.

### E.     The Plaintiff's Claims Post-Dating the July 18, 2006, Evidentiary Hearing

On July 18, 2006, the court held an evidentiary hearing solely for the purpose of determining whether the plaintiff was entitled to any injunctive relief.  (Hearing Transcript).  At this hearing, both Dr. Hudson and Captain Richburg testified.  (*Id*.).  On July 16, 2007, after the plaintiff continued to file numerous affidavits containing new allegations, the court entered an order stating that the plaintiff will not be permitted to amend his complaint absent a showing of good cause.  (Doc. 84 at p. 3).

### 1.     November 20, 2006, and June 15, 2007, Allegations

After the evidentiary hearing, but prior to the court's order on July 16, 2007, the plaintiff filed three documents, dated November 20, 2006 and June 15, 2007.  (Doc. 78, 79 & 83).  The first document, labeled "Factual Allegations", which was supported by an affidavit, alleged that on October 15, 2006, officers Freeman and Groce, two individuals

who were never  named as defendants, physically abused the plaintiff with pepper spray. (Doc. 78 & 79).  The plaintiff also states that Officer Witherspoon watched as this occurred.  (*Id.*).  These officers have never been named as defendants, received proper service of process, or been afforded an opportunity to respond to the allegations against them.  Also, since the plaintiff cannot reach an already-named defendant through the actions of these officers on a *respondeat superior* theory, the factual allegations do not state a claim.  *See Marsh*, 268 F.3d at 1035.

While the allegations in the plaintiff's pleadings are very serious, the court may not dispense with procedural safeguards.  As such, the court will treat these documents as motions to amend which are due to be denied.  The plaintiff may file a separate cause of action against the individuals named in these documents if he chooses to do so before the two-year statute of limitation expires.

Additionally, the plaintiff filed a document labeled "Renewed Motion for Preliminary Injunction" which alleges that Drs. McGwin and Rhine both stated that the defendant should not be denied medical attention for his asthma.  (Doc.#83).  But, contrary to such statements, plaintiff alleges that both Captain Richburg and Dr. Rhine have ignored his medical complaints. (*Id*.)  Again, the failure of an official to respond to a prisoner's complaint, without more, does not give rise to a cause of action under the constitution.

## 2.    Post-Order Allegations

After the court issued its order, stating that the plaintiff may not amend his complaint absent a showing of good cause (doc. 84), the plaintiff filed numerous

documents containing new allegations.  (Doc. 96, 102, 103, 104, 114 & 117).  These allegations include accusations that officers destroyed and damaged his legal papers and made them smell "vile and soaking wet with mold and mildew" (doc. 96), that other unnamed defendants "refused" to provide him adequate medical care (doc. 102, 103 & 104), that prison officials denied him notary services (doc. 114), that he witnessed corrections officers instruct nurses not to treat him (*id*.), that he was physically assaulted on December 12, 2007, January 6, 2008, and January 23, 2008 (*id*.), and that he heard officers conspire to kill him (*id*.).

Because this case has been ongoing for nearly three years and because allegations after the court's July 16, 2007 order include many named and unnamed defendants who have not had the opportunity to respond to new allegations of constitutional deprivation and various misconduct, the court finds that the plaintiffs' documents containing allegations not relating to events taking place prior to the July 16, 2007 order should be construed as motions to amend and denied.  However, the plaintiff will have leave to file a separate suit based on these facts, as long as he does so within the two-year statute of limitations.

## III.    THE PLAINTIFF'S OTHER PENDING MOTIONS

Also before the court are the plaintiff's numerous pleading and pending motions, including the following: (1) the motion to reconsider the court's preliminary injunctive order (doc. 72); (2) the plaintiff's pleading entitled "Factual Allegations" filed on November 20, 2006 (doc. 78); (3) the motion for additional discovery (doc. 94); (4) the motion for an extension of time to respond (doc. 95); (5) the motion to compel the

corrections defendants to allow the plaintiff to obtain sworn affidavits from certain

inmates (doc. 99); (6) the motion to strike the medical defendants' special report (doc.

101); (7) the motion to amend his complaint (doc. 102); (8) the motion to appoint counsel

(doc. 115); and, (9) the motion to supplement his response (doc. 120).

Upon consideration, the court finds that the motions to reconsider (doc. 72), for

additional discovery (doc. 94), to compel the corrections defendants to allow the plaintiff

to obtain sworn affidavits from certain inmates (doc. 99),[15] to strike the medical

defendants' special report (doc. 101),[16] to amend his complaint (doc. 102),[17] and to

appoint counsel (doc. 115) are due to be denied.  The motion for an extension of time to

respond to the special reports (doc. 95) is moot since substantial time has passed and the

plaintiff has responded.  The "Factual Allegations" (doc. 78) are treated as a motion to

amend and due to be denied to the extent the plaintiff seeks to advance new claims.[18]  The

motion to supplement the plaintiff's response (doc. 120) is due to be granted in part only

to the extent the document (Exhibit A) is received by the court for consideration on the

pending matters.[19]

---

[15]In the motion to compel, the plaintiff seeks to confer with various other inmates to obtain sworn statements.  (Doc. 99).  He does not specify the information within the possession of the named inmates.  Additionally, the plaintiff subsequently submitted the affidavits of two of the inmates he sought to communicate with.  (*See* Doc. 107 & 113).

[16]The plaintiff incorrectly asserts that the medical defendants' special report was filed late.  (Doc. 101).  However, the court notes that it was timely filed on September 6, 2007.  (Doc. 97).  Even if it were not, the plaintiff has not demonstrated any prejudice warranting the drastic relief requested.

[17]This motion to amend asserts an additional medical claim concerning his asthma and names additional defendants.  (Doc. 102).  Accordingly, it is not appropriate for review in this matter at this late juncture.

[18]To the extent the allegations relate to the allowed claims in this matter, the same have been considered by the court in rendering its decision in this matter.

[19]The court notes that the exhibit the plaintiff seeks to have the court consider involves an administrative grievance the plaintiff filed against non-defendant, Douglas Ray Green, R.N., who purportedly falsified a medical record concerning the plaintiff on or about February 21, 2008.  (Doc. 120 and Ex. A).

IV.     **CONCLUSION**

Accordingly, for the reasons stated above, the court has deemed the defendants'
special reports as motions for summary judgment.  As such, those motions are due to be
granted as to all claims prior to the evidentiary hearing on July 16, 2006, with the
exception of the claims against Sgt. Willie Ryans, individually.  The corrections
defendants' motion, insofar as they move for summary judgment in favor of Sgt. Ryans
only are due to be denied.  In addition, the court has deemed the plaintiff's post-July 16,
2006, pleadings that contain new allegations as motions to amend, and those motions are
due to be denied.

Additionally, as just noted, the court finds that the motions to reconsider (doc.
72),[20] for additional discovery (doc. 94),[21] to compel the corrections defendants to allow
the plaintiff to obtain sworn affidavits from certain inmates (doc. 99), to strike the
medical defendants' special report (doc. 101), to amend his complaint (doc. 102), and to
appoint counsel (doc. 115) are due to be denied.  The motion for an extension of time to
respond (doc. 95) is moot.  The "Factual Allegations" (doc. 78) are treated as a motion to
amend and due to be denied to the extent the plaintiff seeks to advance new claims.  The
motion to supplement the plaintiff's response (doc. 120) is due to be granted in part.

The Clerk is **DIRECTED** to serve a copy of this memorandum opinion upon the
plaintiff and upon counsel for the defendants.

**DONE**, this the 11th day of September, 2008.

---

[20]The motion to reconsider (doc. 72) is also moot as the plaintiff has been moved to another institution.

[21]Over two years into this matter, the plaintiff is seeking additional medical record entries and shift logs.  (Doc. 94 at
¶¶ 1 & 4).  At this late juncture, the court does not find further discovery to be necessary or appropriate.

**JOHN E. OTT**
United States Magistrate Judge